2004-NMSC-029

98 P.3d 998

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Tracy JOHNSON, Defendant–Appellant.**

**No. 27,535.**

Supreme Court of New Mexico.

Aug. 20, 2004.

Rehearing Denied Sept. 24, 2004.

John A. McCall Albuquerque, NM, for Appellant.

Patricia A. Madrid, Attorney General, Steven S. Suttle, Assistant Attorney General, Albuquerque, NM, for Appellee.

## OPINION

CHÁVEZ, Justice.

{1} A jury convicted Defendant Tracy Johnson of two counts of first-degree felony murder, contrary to NMSA 1978, § 30-2-1(A)(2) (1994);. armed robbery, contrary to NMSA 1978, § 30-16-2 (1973); conspiracy to commit armed robbery, contrary to NMSA 1978, § 30-28-2 (1979) and Section 30-16-2; possession of a firearm by a felon, contrary to NMSA 1978, § 30-7-16(A) (2001); and tampering with evidence, contrary to NMSA 1978, § 30-22-5 (1963, prior to 2003 amendment). We review Defendant's convictions pursuant to Article VI, Section 2 of the New Mexico Constitution and Rule 12-102(A)(1) NMRA 2004.

{2} Defendant argues the trial court violated his right to confront the witnesses against him when it admitted a tape recording of an unavailable accomplice's custodial police interview, and that such error was not harmless beyond a reasonable doubt. Since Defendant filed this appeal, the United States Supreme Court decided *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which held that out-of-court "testimonial" statements are inadmissible against a criminal defendant absent a showing of both "unavailability and a prior opportunity for cross-examination." *Id.* at 1374. The State concedes the recording at issue in this case was admitted in violation of Defendant's Sixth Amendment right of confrontation under *Crawford*. Although the State acknowledges this case "presents an extremely close call on the issue of harmless error," the State asks that we decide this close case in its favor, on the basis that the improper admission of the accomplice statement was harmless beyond a reasonable doubt. However, because the accomplice's inadmissible statement provided key evidence directly inculpating Defendant, and the remaining circumstantial evidence against him, although strong, was disputed, we conclude the error was not harmless with respect to all convictions except the conviction

of tampering with evidence. Accordingly, we reverse Defendant's convictions of felony murder, armed robbery, conspiracy to commit armed robbery, and felon in possession of a firearm, and we affirm Defendant's conviction of tampering with evidence.

## I. Background

{3} The two victims were beaten, robbed, and killed inside a residence belonging to one of them. One victim had been shot three times—once in the head, once in the chest, and once in the back—and had been struck in the head by a hard, curved object, consistent with a tire iron. The other victim had been shot twice—once in the head and once in the chest—and had also been struck in the head by a hard, curved object. A ballistics expert testified that all five bullets were fired from the same firearm. However, neither the murder weapon nor any of the items stolen from the house were ever recovered.

{4} It was undisputed at trial that on the evening of the killings, Defendant, along with acquaintances Jamall Young ("Young"), Coley Ingram ("Coley"), and Jeff Hoff ("Hoff"), returned to the victim's house to purchase cocaine, where they had made a drug purchase earlier in the day with Coley's brother, Wayne Ingram ("Wayne"). During this second drug transaction but prior to the commencement of the robbery, Defendant and Coley went by themselves into a bathroom, leaving Hoff and Young in the bedroom with the two victims. What occurred after these events is disputed, and the State's theory is significantly different from Defendant's.

{5} The State argued that, while in the bathroom, Defendant and Coley formed a conspiracy to commit armed robbery, then used a firearm and a tire iron to rob and murder the two victims. Defendant's theory at trial, directly supported by his own testimony, was that while in the bathroom he not only rejected Coley's proposal to rob the victims, but believed he had talked Coley out of committing a robbery. Further, Defendant claimed that once the robbery commenced, he tried to stop Coley from committing the robbery by urging him to put away the firearm.

{6} Over Defendant's objections at trial, the State introduced the tape-recorded police interview of Young. Young did not testify at trial, nor did Defendant at any time have an opportunity to cross-examine Young on his statement. In the portion of the statement that was played for the jury, Young provided the only direct evidence that Defendant wielded a weapon or participated as an accomplice in the crimes. Further, Young's statement provided the only direct evidence that Defendant himself stole property from the victims.

## II. Young's Custodial Statement

### A. Application of Crawford

■ {7} The State does not dispute that the tape recording of Young's police interview was admitted in violation of Defendant's Sixth Amendment right of confrontation under *Crawford*, which held that out-of-court "testimonial" statements are inadmissible unless there has been a showing of "unavailability and a prior opportunity for cross-examination." 541 U.S. at ——, 124 S.Ct. at 1374. The Supreme Court did not decide, however, the full scope of the term, "testimonial":

> We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; *and to police interrogations.* These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

*Id.* (footnote omitted and emphasis added). Because Young's custodial interview falls squarely within the class of "testimonial" evidence under *Crawford*, 541 U.S. at ——, 124 S.Ct. at 1365, we need not in this case attempt to delineate more fully the scope of that term. We simply hold that, under *Crawford*, because Defendant did not have an opportunity to cross-examine Young, the admission of Young's statement constituted a per se violation of Defendant's Sixth Amendment right of confrontation. We must address, therefore, whether the violation was harmless in this case.

## B. Principles of constitutional harmless error

■ {8} Except in cases involving "structural" errors, which are subject to per se reversal, we are bound to apply the harmless-error analysis outlined in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), to federal constitutional errors. *See Neder v. United States*, 527 U.S. 1, 7–8, 15–16, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). In order to conclude a non-structural constitutional error does not require reversal, we must conclude the error was "harmless beyond a reasonable doubt." *Chapman*, 386 U.S. at 24, 87 S.Ct. 824. Underlying the *Chapman* analysis is the acknowledgment "that there may be some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring the automatic reversal of the conviction." *Id.* at 22, 87 S.Ct. 824. Thus, the United States Supreme Court in *Chapman* fashioned a rule that would balance the Court's inherent interest in vindicating federal constitutional guarantees against the utility of blocking the traditional practice of automatically "setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Id.*

■ {9} The Court has articulated the constitutional harmless-error standard variously since *Chapman* was decided, but the central focus of the *Chapman* inquiry has always been "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* at 23, 87 S.Ct. 824 (quotation marks and quoted authority omitted). Stated differently, in the context of an essential element that was not presented to the jury, the reviewing court must be able to "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error[.]" *Neder*, 527 U.S. at 19, 119 S.Ct. 1827; *see Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) ("The inquiry ... is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error."). Once the constitutional error has been established, the burden is on the State to demonstrate the error is harmless beyond a reasonable doubt. *See Brecht v. Abrahamson*, 507 U.S. 619, 630, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993).

■ {10} In conducting this inquiry, the reviewing court must ever bear in mind that criminal defendants have a constitutional right to have a jury, not appellate court judges on review, decide guilt or innocence. *See Sullivan*, 508 U.S. at 279, 113 S.Ct. 2078 ("[T]o hypothesize a guilty verdict that was never in fact rendered—no matter how inescapable the findings to support that verdict might be—would violate the jury-trial guarantee."); *cf. Rose v. Clark*, 478 U.S. 570, 578, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (noting that harmless-error review does not apply where the judge directs a verdict, because "the wrong entity judged the defendant guilty"). Therefore, it is imperative that a reviewing court be guided not by its own assessment of the guilt or innocence of the defendant—a matter which is irrelevant to the question whether the constitutional error might have contributed to the jury's verdict—but rather by an objective reconstruction of the record of evidence the jury either heard or should have heard absent the error and a careful examination of the error's possible impact on that evidence. *See Yates v. Evatt*, 500 U.S. 391, 404–05, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991) (examining the "probative force" of the constitutional error against the "probative force" of the evidence considered by the jury), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 73 n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). If, at the end of that examination, we conclude there is a reasonable possibility the evidence complained of might have contributed to the conviction, we must reverse.

■ {11} In the specific context of a Confrontation Clause violation, as we are faced with in this case, the Supreme Court in *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), stated that the reviewing court must examine various factors in conducting its harmless-error inquiry:

These factors include the importance of the witness' testimony in the prosecution's

case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

We emphasize that constitutional error must not be deemed harmless solely based on overwhelming evidence of the defendant's guilt; the overall strength of the prosecution's case is but one factor in our harmless-error analysis. The central focus of the inquiry, for which the *Van Arsdall* factors are but a guide, is whether there is a reasonable possibility the erroneous evidence might have affected the jury's verdict.

### C. Testimony admitted at trial

#### 1. Testimony of Hoff

{12} Hoff testified that he was in the bedroom when Defendant and Coley left the room together. Hoff began to wonder what they were doing, and he left the room to look for them. Hoff found them in the bathroom discussing something. Defendant then told Hoff to "get out" and that they were "handling business." After Defendant shut the bathroom door, Hoff stood by the door for about twenty seconds, trying to listen in on the conversation. Hoff could not make out what the two men were saying, but it sounded "like arguing, like maybe kind of anger." It sounded as though "one person didn't want to do it and one person did." After about twenty seconds, Defendant and Coley came out of the bathroom and returned to the bedroom.

{13} During his direct examination, Hoff testified that as the two men entered the bedroom, Defendant said to the two victims, "[W]e're gonna jack ya," which Hoff interpreted to mean they were going to rob the two men. Hoff's testimony on this point, however, was called into question on cross-examination: there, Hoff conceded that he had earlier told the police that it was Coley, not Defendant, who said those words. Coley then turned to Hoff and, while pulling a tire iron out of his pants, asked Hoff whether he was "in or out." Hoff responded, "I don't want no part of this," turned around, left the house, and waited for them in the car.

{14} At no point did Hoff see Defendant with a firearm, nor did he ever see Defendant holding a tire iron. Further, at no point did Hoff see Defendant in possession of any of the stolen property.

{15} As Hoff was sitting outside in the back seat of the car, Young brought an assault rifle out from the house and placed it in the back seat next to him. Young made two more trips with stolen property out to the car over a period of several minutes. After Young's third trip to the car, Hoff heard five gunshots report from the house. Moments later, Defendant, Young, and Coley emerged from the house. Then Defendant and Young got into the car while Coley stayed behind. Defendant drove the car back to Defendant's house. During the ride, Hoff inquired whether the victims had been killed. Hoff could not recall whether he had asked Defendant if Defendant himself killed the victims or whether he had asked Defendant and Young if they had killed the victims. Nevertheless, although disputed by Defendant, Hoff testified that Defendant replied, "Yeah," when the question was asked. According to Hoff, Defendant also repeatedly proclaimed that he was a "G," which Hoff interpreted to mean a "gangster."

{16} Finally, Hoff testified that when the three men—Defendant, Young, and Hoff—returned to Defendant's house, Wayne was there. Hoff wanted to leave, so he picked up the telephone to call his mother for a ride home. Defendant told Hoff to hang up the phone and to walk home. Defendant then told Wayne to "watch" Hoff to ensure he does not "go to the cops." After Defendant left the room, Hoff again used the telephone to call his mother. Hoff's mother picked him up at the canal about a quarter of a mile away. Wayne walked with Hoff to the canal, where Hoff's mother gave Wayne a ride to his destination.

#### 2. Testimony of Wayne Ingram

{17} Wayne Ingram, although he was not present during the commission of any of the crimes, did spend portions of the evening with the other men as they drove around Carlsbad, including a stop at the victim's house when the group first went there to

purchase drugs. Wayne testified about a telephone call he received sometime after midnight on the night of the killings, allegedly sometime before the commencement of the robbery. During this call Wayne talked at different times both to his brother and to Defendant, and one of the two men asked Wayne where they could get a firearm. Wayne testified he could not recall which of the two men asked him about the firearm; however, he admitted that he had earlier told the police it was Defendant who asked the question. He also conceded during cross-examination, however, that he might have told the police it was Defendant rather than Coley because "I was trying to help my little brother."

{18} Wayne also testified concerning the events that took place when the three men returned to Defendant's house that morning, sometime around 4:00 or 5:00 a.m. Wayne had been asleep at Defendant's house for a few hours, and was awakened when he heard Defendant, Young, and Hoff return. Wayne confirmed that one of the two men, Defendant or Young, asked him to "keep an eye on Hoff"; he could not recall, however, which of the two men said those words.

### 3. Testimony of Defendant

{19} Defendant testified at trial, directly contradicting both key testimony of Hoff and Wayne and facts asserted in Young's police statement. Defendant testified that in the early morning hours, before the second trip to the victim's house, Coley used the telephone to call Defendant's house. Coley called to talk to Wayne, who was at Defendant's house at the time, to tell him they were going to pick him up. Although Defendant also talked to his father during that call, he denied asking anyone about finding a gun.

{20} After the call, the four men drove to the house where the previous drug purchase had transpired. Defendant testified that he did not participate in either the robbery or the killings. According to Defendant, when the six men were in the bedroom ingesting cocaine, Coley called Defendant out of the bedroom to talk to him. Having stepped into the bathroom with Defendant, Coley asked Defendant how much money he had; Defendant replied he had fifty dollars. Coley then said, "[Y]ou know what . . . we don't have to

buy it, we can take it." Defendant replied, "We don't have to take it, we're straight." Coley appeared to relent, and the two men left the bathroom. As soon as they reached the bedroom, however, and to Defendant's surprise, Coley pulled out a firearm and said to the victims, "[T]his is a jack." He then turned to Hoff and asked, "[A]re you in or are you out?" Hoff replied, "I'm out," and left the room.

{21} Defendant testified that when Coley pulled the gun out, he told Coley to put the gun away. Coley asked the two victims where the drugs were, but they repeatedly said there were no more drugs in the house. In response, Coley stated, "[D]on't act stupid with me." Coley then put the firearm into his pants and picked up a black tool box, which he threw at the two victims. The tool box fell open, and a tire iron fell out of the box. Coley grabbed the tire iron and used it to strike one of the victims.

{22} Defendant testified that when Young returned to the bedroom, Young went over to the other victim and started "beating him up." Coley again demanded to know where the drugs were, and one of the victims responded, "[Y]ou've got all the dope[,] Coley, just take everything, I'm not going to say nothing." Coley again struck both victims with the tire iron, and continued to demand to know where the drugs were. After Coley again pulled out the firearm, he then turned, pointed it, and fired at one of the victims. At this point Defendant ran out of the house.

{23} According to Defendant, during the robbery he repeatedly told Coley to put away the firearm, and at no point did Defendant himself wield either the firearm or the tire iron. Defendant also testified that at no point did he agree to participate in, assist, or encourage the robbery in any way. He asserted that it was Coley alone who struck the two victims with the tire iron and shot them with the firearm. Defendant established that Coley was a large man, approximately six feet, two inches tall and 270 pounds, and that by comparison Defendant was much smaller—five feet, six inches tall and 170 pounds. When asked why he did not physically attempt to stop Coley from committing the armed robbery, Defendant replied, "How

am I going to stop Coley? What am I going to do? All I could tell him is put the ... gun down.... I can't—I'm not going to wrestle with him for the gun, I'm not going to attack him."

{24} Defendant testified that he did not remove any property from the victim's house. After the shootings, they ran out of the house, but Coley stayed behind, saying that he was going to "clean up this mess." On the ride back to Defendant's house, Hoff asked what had happened, and Defendant responded, "Coley shot them fools." There was no further discussion on the way back to Defendant's house.

{25} When they arrived at Defendant's house, Defendant denied both telling Hoff to hang up the telephone and telling Wayne to watch Hoff. He explained by testifying that his father, who was at the house, wanted Wayne to leave. Hoff had just used the telephone to call his mother to come pick him up, and so Defendant told Wayne to get a ride with Hoff.

{26} Finally, Defendant testified that none of the stolen property was taken into his father's house. Rather, he drove the car from his father's house to "the Flume area," where the car got stuck in the sand. As they tried to extricate the car from the sand, Defendant told Young to remove the stolen property from the car. At this point, Defendant saw Young make several trips with the property to a location somewhere in the area.

### 4. Impermissible evidence—Young's tape-recorded statement to the police

{27} According to Young's erroneously admitted statement, just before the armed robbery commenced, Young was in the bedroom when Coley and Defendant left the room together. When Defendant and Coley returned to the bedroom, Defendant was carrying a firearm, and Coley was pulling a tire iron out of his pants. Young was somewhat equivocal on this point, and he conceded to the police that the weapons may have been reversed when they entered the room: the firearm may have been in Coley's hand and the tire iron in Defendant's. Despite this equivocation, Young's statement indicates that he witnessed Defendant wielding the firearm at some point during the ordeal.

{28} Upon entering the bedroom, Coley said to the victims: "this is a jack" or "we're going to jack you." Coley then turned to Young and Hoff and asked, "Are you in or out?" In response, Hoff immediately left, but Young, tacitly agreeing to participate in the robbery, began taking personal property from the house out to the car. Young also admitted that at one point he struck one of the victims with his fist, denying that he himself had wielded either the firearm or the tire iron.

{29} Young made several trips out to the car with stolen property. At one point, when he returned to the house, Young stated that "the weapons had changed," and that Coley was holding the firearm and Defendant was holding the tire iron. Later, when Young was again outside at the car, Young heard several gunshots report from the house. Young went back into the house, where he saw Defendant and Coley both grabbing items from the room. Defendant and Coley then said, "[L]et's go, let's go, let's go," and the three men left the house. After a brief argument, Coley decided to stay behind, and Defendant and Young got into the car with Hoff and left. Young did not mention what happened to the stolen goods after the three men drove away.

{30} Young's statement confirmed that Wayne was at Defendant's house when the three men arrived. Young's statement also confirmed that Hoff used the telephone at one point, and that Hoff and Wayne left the house together. However, Young did not mention Defendant or anyone else telling Hoff not to use the phone or telling Wayne to "watch" Hoff. Finally, Young stated that he and Defendant drove to "the Flumes," where the car got stuck in the sand.

### D. Discussion

{31} Because our harmless-error analysis instructs that "error may be prejudicial with respect to one conviction, but harmless with respect to another," we review the effect of Young's statement with respect to each conviction separately. *Clark v. State,* 112 N.M. 485, 487, 816 P.2d 1107, 1109 (1991).

### 1. Armed robbery

{32} "Robbery consists of the theft of anything of value from the person of another or from the immediate control of another, by use or threatened use of force or violence." Section 30–16–2. A conviction of armed robbery requires that the defendant commit robbery "while armed with a deadly weapon." *Id.* Under this theory, the State was required to prove, in relevant part: (1) Defendant took and carried away property from the victims or from their immediate control, intending to permanently deprive them of the property; (2) Defendant was armed with a firearm or tire iron; and (3) Defendant took the property by force or violence. *See* UJI 14–1621 NMRA 2004 (defining elements of armed robbery). Here, Hoff did not see Defendant holding either the firearm or the tire iron, and Defendant denied holding either weapon. Thus, Young's statement provided the only direct evidence at trial that "Defendant took and carried away property," that he "was armed with a firearm or tire iron," and that he "took the property by force or violence." Because Young's statement provided the only direct evidence of guilt with respect to this theory of armed robbery, we conclude there is a reasonable possibility that its erroneous admission contributed to the verdict.

{33} The jury, however, was also instructed under a theory of accomplice liability for armed robbery; therefore, we apply our harmless-error analysis to that conviction as well. *See* NMSA 1978, § 30–1–13 (1972) ("A person may be charged with and convicted of the crime as an accessory if he procures, counsels, aids or abets in its commission … although he did not directly commit the crime[.]"). To convict Defendant under a theory of accomplice liability for armed robbery, the State in this case was required to prove, in relevant part: (1) Defendant intended that the armed robbery be committed; (2) the armed robbery was committed; and (3) Defendant helped, encouraged, or caused the armed robbery to be committed. *See* UJI 14–2822 NMRA 2004 (defining elements of accessory to a crime other than attempt and felony murder). It was undisputed at trial that Defendant's alleged accomplice, Coley, committed armed robbery, thus satisfying the second element. We therefore review whether Young's statement was harmless beyond a reasonable doubt with respect to the first and third elements.

{34} Accomplice liability requires that the defendant "share the criminal intent of the principal. There must be community of purpose, partnership in the unlawful undertaking." *State v. Ochoa,* 41 N.M. 589, 599, 72 P.2d 609, 615 (1937). Indicia of such criminal intent "may be as broad and varied as are the means of communicating thought from one individual to another[.]" *Id.* Nevertheless, "[m]ere presence, of course, and even mental approbation, if unaccompanied by outward manifestation or expression of such approval, is insufficient." *Id.*

{35} The State concedes this case "presents an extremely close call on the issue of harmless error." The State argues, however, even discarding Young's statement, the other evidence of Defendant's intent to commit armed robbery was so overwhelming, and the impact of Young's statement so minuscule by comparison, that it could not possibly have contributed to the verdict. *See State v. Moore,* 94 N.M. 503, 504, 612 P.2d 1314, 1315 (1980) (outlining a three-prong test to determine whether an evidentiary error was harmless).

{36} In this case, we cannot conclude beyond a reasonable doubt that Young's direct, eyewitness account was "so unimportant and insignificant" that it could not have contributed to the verdict. *Chapman,* 386 U.S. at 22, 87 S.Ct. 824. While there is much other circumstantial evidence from which reasonable inferences of Defendant's guilt might have been derived, Young's statement provides the direct evidence of Defendant's intent to commit armed robbery that rendered such inferences unnecessary. Because Hoff did not at any time see Defendant holding either a firearm or a tire iron, Young's statement provided the only direct evidence that Defendant was armed. Because Hoff did not at any time see Defendant in possession of any of the stolen property, Young's statement provided the only direct evidence that Defendant took or helped take the stolen items. Either of these facts, if believed, conclusively inculpates Defendant as an accomplice to the armed robbery, because ei-

ther fact conclusively establishes Defendant's intent to commit armed robbery. With respect to the first *Van Arsdall* factor, therefore, Young's statement was of central importance to the prosecution's case against him on the charge of armed robbery.

{37} Regarding the second *Van Arsdall* factor, the State argues that portions of Young's statement were merely cumulative of Hoff's testimony on the same points, and therefore harmless beyond a reasonable doubt. *See State v. Woodward,* 121 N.M. 1, 10, 908 P.2d 231, 240 (1995) ("The erroneous admission of cumulative evidence is harmless error because it does not prejudice the defendant."). First, however, whether evidence is cumulative is merely one factor in the "host of factors" outlined in *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431. Therefore, improperly admitted evidence that is cumulative is not *ipso facto* harmless beyond a reasonable doubt: the reviewing court must further inquire into the *effect* that evidence might have had on the jury's verdict. Second, we clarify that when determining whether certain erroneously admitted evidence is "cumulative," the reviewing court must carefully assess the degree to which that evidence corroborated other similar evidence of the defendant's guilt. To the extent the evidence corroborates, and therefore strengthens, the prosecution's evidence, it cannot be deemed "cumulative" as we understand that term.

{38} Black's Law Dictionary defines "cumulative evidence" as "[a]dditional evidence of the same character as existing evidence and that supports a fact established by the existing evidence (esp. that which does not need further support)." Black's Law Dictionary 577 (7th ed.1999). We agree with the following articulation of the scope of the term:

> Cumulative evidence is additional evidence of the same kind tending to prove the same point as other evidence already given; evidence of other and different circumstances tending to establish or disprove the same fact is not cumulative; nor is evidence of facts tending to prove circumstantially the existence of a fact cumulative to evidence which tends to establish the same fact directly.

*State v. Harris,* 334 Mo. 38, 64 S.W.2d 256, 258 (1933) (quotation marks and quoted authority omitted) (holding it was reversible error for trial court to exclude the defendant's alibi evidence on the basis that it was cumulative). Because direct evidence is of a different character than circumstantial evidence, we cannot deem evidence that tends *directly* to prove a particular fact cumulative of other evidence that tends to prove that same fact *circumstantially.*

{39} Further, we must carefully evaluate the degree to which the inadmissible evidence might have operated to *corroborate* other similar evidence of guilt. The distinction has been articulated thus: [c]orroborative evidence tends to corroborate or to confirm, whereas cumulative evidence merely augments or tends to establish a point *already proved* by other evidence. *State v. Kennedy,* 122 Ariz. 22, 592 P.2d 1288, 1292 (Ct.App.1979) (emphasis added). The probative force—and therefore the possible prejudicial effect—of a particular piece of evidence tends to decrease the more redundant that evidence is in the context of other similar evidence. Therefore, only in very clear instances of accumulated evidence—where the evidence is so redundant that its corroborative effect is negligible—should the improper admission or exclusion of one accretion of such evidence be considered "cumulative" for purposes of our harmless-error analysis.

{40} The key element in this analysis is the degree to which the erroneously admitted evidence strengthened or corroborated the other evidence of guilt. If, for example, there were three pieces of properly admitted evidence of the same character supporting the same finding of fact, the erroneous introduction of a fourth might be properly deemed cumulative, in the sense that its admission would almost certainly have a negligible corroborative effect upon the other similar evidence. *See State v. Lopez,* 2000–NMSC–003, ¶ 21, 128 N.M. 410, 993 P.2d 727 (holding that improper testimony was cumulative of testimony of three other witnesses, who each "described substantially the same events, same statements, and same description" of the crime scene, and therefore harmless beyond a reasonable doubt); *State v.*

*Worley,* 100 N.M. 720, 725, 676 P.2d 247, 252 (1984) (holding that the inferences that might have been drawn from the silence of a codefendant not subject to cross-examination were cumulative of testimony provided by three eyewitnesses, and therefore harmless constitutional error). On the other hand, were there only one other piece of admissible evidence of the same character supporting the same finding, the inadmissible evidence in that case would clearly have had, if believed, a greater corroborative effect. Regardless of whether there exists other properly admitted evidence to support the same factual finding, therefore, the correct inquiry is whether the erroneously admitted evidence was "so unimportant and insignificant," *Chapman,* 386 U.S. at 22, 87 S.Ct. 824 that its corroborative effect upon other evidence of guilt was negligible.

{41} Here, certain portions of Young's statement, viewed in isolation, were arguably cumulative. The two admissible eyewitness accounts—Hoff's and Defendant's—establish that Defendant had a discussion with Coley in the bathroom immediately prior to the commencement of the armed robbery. Both accounts agree that Defendant returned to the bedroom with Coley and remained with him during the entire criminal episode. Finally, both accounts agree that Defendant drove the vehicle containing the stolen property away from the crime scene. Because Defendant does not contest these particular facts, the corroborative effect of Young's statement on these points was negligible. Therefore, we may conclude that Young's additional eyewitness support on these points was cumulative.

{42} Ultimately, however, the prejudicial portions of Young's statement are not those which are uncontradicted and corroborated by multiple other sources, but those which are in dispute and which provide strong direct evidence that Defendant intended the armed robbery to be committed. Young's statement provides the only direct evidence at trial that Defendant (1) threatened the victims with a weapon during the robbery, (2) grabbed the victims' property, and (3) assisted Coley in carrying out the robbery. Contradicting this direct evidence, Defendant testified that he did not at any time hold either the firearm or tire iron, that he never touched any of the stolen items, and that he actively tried to persuade Coley to put away the firearm. While Defendant admitted remaining in the bedroom with Coley, Defendant directly disputed those portions of Young's statement that indicate Defendant intended the armed robbery to be committed and that he assisted Coley in committing the robbery. Defendant's testimony directly contradicted critical portions of Young's statement, a fact which bears on our analysis of the third *Van Arsdall* factor, "the presence or absence of evidence ... contradicting the testimony of the witness on material points[.]" *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431.

{43} On this point, the State asks that we not attach too much significance to Defendant's testimony because he presented no additional conflicting evidence to discredit the prosecution's case, and because the jury was free to disregard Defendant's "rather expected version of the events." As an appellate court, however, we are not in a position to judge the credibility or weight of Defendant's testimony. If it were otherwise, we would "become in effect a second jury to determine whether the defendant is guilty." *Neder,* 527 U.S. at 19, 119 S.Ct. 1827 (quotation marks and quoted authority omitted). Instead, the correct inquiry is whether there exists a reasonable possibility the evidence complained of might have contributed to the jury's verdict. Defendant offered testimony which, if believed, directly contradicts crucial facts necessary for a determination that he intended the armed robbery to be committed. We cannot say, therefore, that the erroneous admission of Young's statement was harmless beyond a reasonable doubt.

{44} Arguably, one could cobble together sufficient evidence, essentially uncontested, to conclude the jury might have convicted Defendant as an accomplice to armed robbery even without considering Young's statement. The undisputed evidence that Defendant discussed robbing the two men with Coley in the bathroom, that Defendant remained in the room with Coley while the armed robbery was committed, and that Defendant drove the vehicle containing the stolen property gives rise to a reasonable infer-

ence that Defendant intended the armed robbery to be committed. We sharply distinguish, however, review for sufficiency of evidence from harmless-error review. In reviewing whether constitutional error is harmless, we do not indulge all reasonable inferences tending to show guilt. On the contrary, we examine "whether the record contains evidence that could rationally lead" to a verdict of not guilty. *Neder*, 527 U.S. at 19, 119 S.Ct. 1827.

{45} Further, we emphasize that for purposes of harmless-error review, we review not the case the State might have presented, but the case the jury actually heard. *See Sullivan*, 508 U.S. at 279, 113 S.Ct. 2078. Specifically, we inquire whether the erroneously admitted evidence possibly influenced the evidence the jury actually considered, not some hypothetical pattern of evidence pieced together after the fact. In this case, the State's particular reliance at trial on Young's overwhelmingly inculpatory statement further militates in favor of a new trial. The prosecutor concluded his closing statement to the jury as follows:

> Ladies and gentlemen, I know you have your own recollection of this evidence. The key importance is the statement that was made by Jamal[l] Young against him. Not only does that statement corroborate everything that Hoff tells you, but it implicates [Defendant] in everything that they did. Everything. In for a penny, in for a pound.

It should be no surprise that the case actually presented to the jury relied so heavily on Young's statement. The prosecutor knew that Young's statement, standing by itself, would have been sufficient to convict Defendant of armed robbery: Young's account directly puts a gun in Defendant's hand and stolen goods in his pocket. This is the case the jury actually heard, and Young's statement lies at its core. We cannot conclude beyond a reasonable doubt that this evidence, which the jury actually heard, was of so little consequence that it did not contribute to the verdict.

### 2. Felony murder

{46} Felony murder consists of "the killing of one human being by another without lawful justification or excuse, by any of the means with which death may be caused ... in the commission of or attempt to commit any felony[.]" Section 30–2–1(A)(2). Our case law regarding felony murder states an additional mens rea element that must be proved to the jury beyond a reasonable doubt: "an intent to kill or an intent to do an act greatly dangerous to the lives of others or with knowledge that the act creates a strong probability of death or great bodily harm." *State v. Ortega*, 112 N.M. 554, 565, 817 P.2d 1196, 1207 (1991). Here, armed robbery was the predicate felony for the felony-murder charge, and the State prosecuted Defendant for felony murder under a theory of accomplice liability.

{47} It was undisputed that Defendant's alleged accomplice, Coley, committed armed robbery "under circumstances or in a manner dangerous to human life" and that the victims were killed in the course of the armed robbery. *See* UJI 14–2821 NMRA 2004 (defining elements of accessory to felony murder). Therefore, the State in this case was required to prove, for each count of felony murder, the following four elements: (1) Defendant helped, encouraged or caused the felony of armed robbery to be committed; (2) Defendant intended that the armed robbery be committed; (3) Defendant helped, encouraged, or caused the killings to be committed; and (4) Defendant knew that he was helping to create a strong probability of death or great bodily harm. *See id.* Defendant disputed all four of these elements at trial.

{48} Because we have concluded that Young's statement was not harmless beyond a reasonable doubt with respect to Defendant's intent that armed robbery be committed, we must also conclude the statement was prejudicial with respect to his felony-murder conviction, based as it is on the underlying felony of armed robbery. In addition, we note that, because Young's statement provided the only direct evidence that Defendant wielded the firearm or the tire iron—evidence that was directly rebutted by Defendant's testimony—we conclude that Young's statement was also prejudicial with respect to the jury's determinations that Defendant helped, encouraged, or caused the killings to be committed and that Defendant knew that he was

helping to create a strong probability of death or great bodily harm.

### 3. Conspiracy to commit armed robbery

 {49} "Conspiracy consists of knowingly combining with another for the purpose of committing a felony within or without this state." Section 30–28–2. An overt act is not required; the crime is complete when the felonious agreement is reached. *State v. Davis*, 92 N.M. 341, 344, 587 P.2d 1352, 1355 (Ct.App.1978). Such an agreement need not be proven by direct evidence; the agreement may be in the form of a mutually implied understanding and may be inferred from circumstantial evidence. *Id.* at 342, 587 P.2d at 1353. There being no dispute about Coley's intent to commit armed robbery, the State was required to prove beyond a reasonable doubt both (1) that Defendant intended to commit armed robbery, and (2) that Defendant entered into an agreement with Coley to commit armed robbery.[1] *See* UJI 14–2810 NMRA 2004 (defining elements of conspiracy).

{50} Our harmless-error analysis of the armed-robbery conviction above applies also to these two elements of conspiracy. While Defendant admits he was in the bathroom with Coley when Coley proposed the robbery, Defendant directly disputed the State's theory of the substance of that discussion when he testified that he did not agree to join in the robbery—indeed, that he thought he had persuaded Coley against it. We note that Hoff's testimony tended to corroborate Defendant's account of the bathroom conversation when Hoff said it sounded as though "one person didn't want to do it and one person did." Hoff's and Defendant's testimony on this point, if believed, would lead to a rational conclusion that Defendant had not entered into an agreement at this stage. Such a conclusion would thus heighten the importance of Young's statement with respect to the jury's determination that Defendant entered into an agreement with Coley to commit armed robbery: Young's statement provided strong direct evidence that Defendant both intended to commit armed robbery and joined with Coley in committing the armed robbery. Therefore, we cannot say its erroneous admission was harmless beyond a reasonable doubt with respect to this conviction.

### 4. Possession of a firearm by a felon

██ {51} "It is unlawful for a felon to receive, transport or possess any firearm ... in this state." Section 30–7–16(A). There being no dispute that Defendant, in the preceding ten years, had been convicted and sentenced to one or more years imprisonment, the State was required to prove that Defendant possessed a firearm at some point during the criminal episode. *See* UJI 14–701 NMRA 2004 (defining elements of possession of a firearm by a felon). Hoff did not at any time see Defendant holding a firearm. Young's statement that he saw Defendant at one time holding the gun provides the only direct evidence that Defendant possessed a firearm. Further, Defendant expressly denied ever holding a firearm, providing evidence directly contradicting the State's otherwise circumstantial case. Young's statement providing both (1) the only direct evidence offered at trial that Defendant possessed a firearm and (2) strong circumstantial evidence from which it may be reasonably inferred that Defendant possessed a firearm, Young's statement almost surely contributed to this verdict. Therefore, its erroneous admission was not harmless beyond a reasonable doubt.

### 5. Tampering with evidence

██ {52} "Tampering with evidence consists of destroying, changing, hiding, placing or fabricating any physical evidence with intent to prevent the apprehension, prosecution

---

1. The State argues that *Crawford* does not apply to Defendant's conviction of conspiracy, on the ground that Coley's declaration of a "jack move" in Defendant's presence was one made in furtherance of a conspiracy and therefore not testimonial. *See Crawford*, 541 U.S. at ——, 124 S.Ct. at 1367 (noting that the category of statements in furtherance of a conspiracy was an established hearsay exception by 1791, and that such statements are not testimonial). Because Coley's declaration of a "jack move" is not testimonial under *Crawford*, the State argues, it was not erroneously admitted. However, the State does not account for the hearsay-within-hearsay problem: Coley's declaration of a "jack move" appears within the broader narrative of Young's statement to the police, and it is this statement, in its entirety, that *Crawford* prohibits.

or conviction of any person or to throw suspicion of the commission of a crime upon another." Section 30–22–5. Under a theory of liability as a principal, the State would be required to prove, in relevant part: (1) Defendant "destroyed or placed" the property taken from the victims; and (2) Defendant intended to prevent his apprehension, prosecution or conviction. *See* UJI 14–2241 NMRA 2004 (defining elements of tampering with evidence). Because the jury was instructed on a theory of accomplice liability for this charge, however, the State was required to prove at trial: (1) Defendant intended that the crime of tampering with evidence be committed; (2) the crime was committed; and (3) Defendant helped, encouraged, or caused the crime to be committed. *See* UJI 14–2822 (defining elements of accessory to a crime other than attempt and felony murder).

{53} Young's statement is silent with respect to what happened ultimately to the stolen property and whether Defendant had a role in disposing of any physical evidence. Because Young's statement did not serve to strengthen or corroborate the other evidence of guilt, we conclude its erroneous admission was harmless beyond a reasonable doubt with respect to this conviction.

{54} Because Defendant also asserts there is insufficient evidence in the record to sustain this conviction, we review "whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Sutphin*, 107 N.M. 126, 131, 753 P.2d 1314, 1319 (1988) (describing the standard of review for sufficiency of evidence); *see also State v. Garcia*, 114 N.M. 269, 273–74, 837 P.2d 862, 866–67 (1992) (emphasizing the requisite scrutiny to be applied). Defendant's own testimony indicated his intent that the physical evidence be "placed" when he directed Young to remove the stolen property from the car, thus satisfying the first element of accomplice liability. Although Defendant testified he did not know what happened to the stolen property, Defendant did testify that he saw Young

taking the stolen property from the car to another location. The other circumstantial evidence leads to a reasonable inference Young moved the evidence with the intent to prevent his apprehension, prosecution, or conviction, thus satisfying the second element. Finally, Defendant testified he drove the car from his father's house to "the Flume area" with the specific purpose of disposing of the stolen property, satisfying the third element. Viewing the evidence in the light most favorable to the State, resolving all conflicts and indulging all permissible inferences in favor of the verdict, *see id.*, the State has presented sufficient evidence to support a verdict that Defendant committed tampering with evidence under a theory of accomplice liability.

### III. Conclusion

{55} We reverse Defendant's convictions of conspiracy to commit armed robbery, armed robbery, felony murder, and felon in possession of a firearm, and remand for a new trial. We affirm Defendant's conviction of tampering with evidence.

{56} **IT IS SO ORDERED.**

WE CONCUR: PETRA JIMENEZ MAES, Chief Justice, PAMELA B. MINZNER, and RICHARD C. BOSSON, Justices.

PATRICIO M. SERNA, Justice (concurring in part and dissenting in part).

SERNA, Justice (concurring in part, dissenting in part).

{57} I concur with the majority's application of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) to Young's out-of-court testimonial statement. I also concur with remanding for a new trial on Defendant's conviction of felon in possession of a firearm and with affirming Defendant's conviction of tampering with evidence. However, I respectfully disagree with the discussion of harmless error. Applying the harmless error standard articulated by the United States Supreme Court, I would affirm Defendant's convictions of felony murder [1] and conspiracy.

---

1. The State concedes that the conviction of armed robbery would merge with the conviction of felony murder if the latter conviction were to be affirmed.

{58} The majority discusses at length the meaning of cumulative evidence in the context of harmless error. The majority modifies this Court's prior understanding of cumulative evidence by concluding that, in order to be cumulative, evidence must have no corroborative effect, or only a "negligible" effect, on other evidence of guilt. I respectfully disagree with this analysis. The United States Supreme Court has explained that one factor relevant to a constitutional harmless error inquiry is whether the erroneously admitted evidence is cumulative to properly admitted evidence. *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). New Mexico courts have repeatedly adhered to the general rule that the erroneous admission of cumulative evidence does not prejudice the defendant and is harmless beyond a reasonable doubt. *State v. Woodward*, 121 N.M. 1, 10, 908 P.2d 231, 240 (1995); *accord, e.g., State v. Lopez*, 2000–NMSC–003, ¶ 20, 128 N.M. 410, 993 P.2d 727 (applying *Woodward* to a Confrontation Clause violation); *State v. Martinez*, 1999–NMSC–018, ¶ 25, 127 N.M. 207, 979 P.2d 718 (applying *Woodward* to a constitutional violation); *State v. Martinez*, 1996–NMCA–109, ¶¶ 19–20, 122 N.M. 476, 927 P.2d 31 (applying *Van Arsdall* and *Woodward* to a Confrontation Clause violation and noting the cumulative nature of the evidence). I am unable to find any indication in *Van Arsdall*, or subsequent cases, that the Supreme Court's reference to cumulative evidence meant that, in order to be harmless, the evidence must be cumulative to evidence that is itself already cumulative. As the majority notes, the term cumulative simply means additional evidence of a similar character as existing evidence. The definition of this term requires duplication; it does not, in my view, require triplication or quadruplication, as the majority seems to suggest. I agree that not every instance of cumulative evidence can be considered harmless, but I respectfully disagree that harmlessness based on cumulative evidence is limited to "very clear instances of accumulated evidence." Majority opinion, ¶ 39. I respectfully do not believe this to have been the Supreme Court's intended meaning of cumulative evidence.

{59} Our cases have uniformly accepted the rationale that cumulative evidence does not cause prejudice. The majority rejects this principle based on the possibility that the erroneously admitted evidence may have had a corroborative effect on the properly admitted evidence. I respectfully believe that this rationale conflicts with the harmless error standard established by the Supreme Court, which is binding on this Court in our application of the Confrontation Clause. Under *Neder v. United States*, 527 U.S. 1, 18, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999), appellate courts faced with a Confrontation Clause violation must answer the following question in assessing whether the error was harmless as a matter of federal constitutional law: "Is it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?" This standard establishes an objective measure of harmless error under which we must evaluate the effect of a constitutional error by looking to a rational jury's evaluation of the properly admitted evidence. This standard does not contemplate an appellate reconstruction of the jury's deliberations to determine whether the jury based its decision on a particular piece of evidence. As a result, it is not necessary to speculate about a potential corroborative effect that the improperly admitted evidence had on the properly admitted evidence. By requiring inquiry "into the *effect* that evidence might have had on the jury's verdict," Majority opinion, ¶ 37, the majority applies a harmless error approach that has been specifically rejected by the Supreme Court.

{60} Under the *Neder* standard, the notion of corroboration has a different significance. If the improperly admitted evidence is corroborated by properly admitted evidence, then the importance of the improperly admitted evidence is diminished; the corroborating evidence supports the same verdict by a rational jury without reference to the improperly admitted evidence as the verdict reached by the actual jury with the improperly admitted evidence. Thus, contrary to the use of the notion of corroboration in the majority opinion, the existence of evidence corroborating the improperly admitted evidence makes it more likely that the error will be deemed

harmless. *See Idaho v. Wright*, 497 U.S. 805, 823, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990); *Van Arsdall*, 475 U.S. at 684, 106 S.Ct. 1431; *see also State v. Ross*, 1996–NMSC–031, 122 N.M. 15, 27, 919 P.2d 1080, 1092.

{61} Relying on what I believe to be a mistaken view of corroboration in the context of harmless error, and focusing on the impact of the impugned evidence on the jury's actual deliberations, the majority determines that harmless error effectively requires that the improper evidence not strengthen or corroborate other evidence of guilt "[r]egardless of whether there exists other properly admitted evidence to support the same factual finding." Majority opinion, ¶ 40. Not only does this new description of harmless error conflict with *Neder*, I believe it also requires the State to prove the impossible. All evidence offered by the prosecution in a criminal trial, if properly admitted by the trial court, will to some degree strengthen or corroborate the evidence of guilt. In order to be admissible, the prosecution's evidence must be relevant, and by definition, relevant evidence has a "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 11–401 NMRA 2004. In my view, this new standard adopted by the majority effectively creates a rule of automatic reversal for *Crawford*-type errors, contrary to binding precedent from the United States Supreme Court.

{62} In this case, there is no question that Young's statement was important to the prosecution. However, most of Young's statement was cumulative to or corroborated by other evidence, much of which came from Defendant himself. The only part of Young's statement that was neither cumulative to nor corroborated by other evidence is the assertion that Defendant held the gun at some point during the robbery. This part of the statement was critical for the conviction of felon in possession of a firearm, making the error prejudicial with respect to this count, but it was simply not necessary to Defendant's culpability for felony murder as an accessory. The State did not have to prove that Defendant shot the gun, held the gun, or even wielded the tire iron in order for the jury to find that Defendant helped, encouraged, or caused the crime to be committed. Young's statements that Defendant and Coley Ingram went into the bathroom in the victim's house prior to the robbery, that Coley asked Hoff whether he was in or out, that Hoff left in response to this question, and that a tire iron and gun were both used in the robbery are cumulative to Hoff's testimony, Defendant's testimony, and the physical evidence from the victims' autopsies. This evidence establishes that Defendant discussed the robbery with Coley, that he had prior knowledge of Coley's intent to commit a robbery, and that, like Hoff, he had an opportunity to extricate himself from the robbery prior to its commission and after he became aware that Coley had a gun. The use of two weapons also supports a reasonable inference that there were multiple perpetrators of the crime.

{63} Other portions of Young's statement, those more generally implicating Defendant as a participant in the robbery and killing, in contrast to the specific statement that Defendant held the gun, are cumulative to some evidence and corroborated by a great deal of other evidence. Most significantly, Young's statement implicating Defendant as a participant in the crime is cumulative to Defendant's confession to Hoff. Although the majority describes Young's statement as "the only direct evidence that Defendant ... participated as an accomplice in the crimes," Majority opinion, ¶ 6, Defendant's confession to Hoff is direct evidence of guilt. Defendant's confession was properly admitted evidence that was before the jury in this case. Hoff testified that Defendant told him either that Defendant or Defendant and Coley together "smoke[d]" the victims and that Defendant bragged about being a gangster as a result of the killings. Hoff further testified that, at the time of the killings, he and Defendant were friends and Coley was merely an associate of two of his friends, Defendant and Young. Hoff also testified that he remembered the incident clearly and, on rebuttal, that he was certain Defendant had not said that Coley was the one who had killed the victims. A confession of guilt by the defendant has "a profound impact" on the

jury. *Arizona v. Fulminante*, 499 U.S. 279, 296, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

{64} Other evidence also corroborated Defendant's participation in the crime. In his testimony before the jury, Defendant conceded that, a short time after the crime, he untruthfully told police officers that he was not at the victims' house at the time of the robbery and murder. This admitted lie to the police not only served to undermine Defendant's credibility but also constituted substantive evidence of a consciousness of guilt. *See State v. Faubion*, 1998–NMCA–095, ¶ 13, 125 N.M. 670, 964 P.2d 834 (stating that lies to the police are evidence of consciousness of guilt); *State v. Lujan*, 103 N.M. 667, 674, 712 P.2d 13, 20 (Ct.App.1985) (similar). As with Defendant's confession to Hoff, this admission to the police containing false information regarding the details of the crime and manifesting a consciousness of guilt is direct evidence of Defendant's participation in the crime aside from Young's statement. *See State v. Wheeler*, 802 S.W.2d 517, 519 (Mo.Ct. App.1989). The jury also had a second, independent evidentiary basis to find a consciousness of guilt. The jury found beyond a reasonable doubt that Defendant tampered with evidence of the robbery, and this Court has determined that this conviction is supported by substantial evidence and is not tainted by Young's statement. Tampering with evidence after the fact constitutes evidence of a consciousness of guilt for the earlier crime. *State v. Martinez–Rodriguez*, 2001–NMSC– 029, ¶ 24, 131 N.M. 47, 33 P.3d 267. "[T]he state of mind that is characterized as guilty consciousness or consciousness of guilt is strong evidence that the person is indeed guilty." *State v. Robertson*, 254 Conn. 739, 760 A.2d 82, 99 (2000) (quotation marks and quoted authority omitted) (alteration in original); *accord Torres v. State*, 794 S.W.2d 596, 598 (Tex.App.1990) ("A 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt. It is consequently a well accepted principle that any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a 'consciousness of guilt' may be received as a circumstance tending to prove that he [or she] committed the act with which he [or she] is charged.") (quotation marks and quoted authority omitted).

{65} Additionally, two witnesses testified about Defendant's actions after the crime. In addition to relating Defendant's confession, Hoff testified that Defendant exited the house with Coley and Young and that Defendant had a "[v]ery calm" demeanor. Hoff also testified that when they returned to Defendant's house Defendant told him to hang up the phone and instructed Wayne Ingram to watch him to make sure he did not report the crime to the police. Defendant conceded that he, and not Young, told Wayne to leave with Hoff, although he denied telling him to watch Hoff, and Wayne corroborated Hoff's testimony by confirming that he was instructed to "keep an eye on Hoff." This testimony from two witnesses establishes that Defendant attempted to prevent the report of the crime, which again demonstrates a consciousness of guilt. The absence of Young's statement, which did not include the subject of Wayne being told to leave or watch Hoff, would not affect a rational jury's assessment of this evidence.

{66} In contrast to the abundant evidence corroborating Young's description of Defendant's participation in the robbery and murders, the only evidence conflicting with Young's statement is Defendant's self-serving, uncorroborated[2] testimony. However, Defendant's testimony was undermined both by his prior inconsistent statements and by the improbability of his story. Defendant's story fails to explain how Hoff, who testified that he did not discuss the details of the crime with any participant beyond Defendant's confession, could have known that a

---

2. The majority attributes to Hoff the testimony that the discussion in the bathroom sounded as though one person wanted to commit the robbery and one did not. However, Hoff's testimony directly contradicts this point. This statement came from a question by defense counsel repeating a question by an officer in an earlier interrogation of Hoff, with which Hoff had at that time only equivocally accepted as partly accurate. In response to this question by defense counsel, Hoff denied that this description of the bathroom conversation was accurate and testified that he did not remember the incident that way. The prior statement could at most only be used to impeach Hoff's testimony; because it was not made under oath, it is not substantive evidence corroborating Defendant's version of events. *See* Rule 11–801(D)(1)(a) NMRA 2004.

tire iron was used in the robbery when, according to Defendant, Coley did not obtain the tire iron until after Hoff had left. In addition, according to Defendant's story, Defendant and the two victims told Coley to put away the gun. Despite this opposition by three men, Coley placed the gun in his waistband to search for a second weapon. Considering the physical evidence establishing that both victims received wounds from a tire iron, a rational jury would understand that it would have been far more likely with multiple victims for one person to hold the gun on the victims to prevent their resistance while another person beat them with the tire iron. Under these circumstances, I do not believe that Defendant's testimony can be viewed as sufficiently conflicting with Young's that, in the absence of Young's testimony, it could have led to an acquittal by a rational jury.

{67} As with the factor of cumulative evidence, the existence of evidence conflicting with the improperly admitted evidence is only one of several *Van Arsdall* factors relevant to a harmless error inquiry. The bare existence of conflicting evidence, without reference to the quality and quantity of that evidence in relation to the properly admitted evidence of guilt, does not lead to automatic reversal under the *Chapman* harmless error standard. For example, in *Ross*, despite the defendant's testimony that he did not intend to kill the victim, 122 N.M. at 19, 919 P.2d at 1084, we concluded in that case that the defendant's self-serving testimony did not constitute substantial conflicting evidence in light of other evidence in the case. *Id.* at 27, 919 P.2d at 1092; *cf. United States v. Blevins,* 960 F.2d 1252, 1263–64 (4th Cir.1992) (determining that a constitutional trial error was harmless despite the defendants' testimony denying culpability); *People v. McPeters,* 2 Cal.4th 1148, 9 Cal.Rptr.2d 834, 832 P.2d 146, 165 (1992) (concluding an error was harmless because the "defendant's guilt was established by the testimony of numerous eyewitnesses as well as corroborating physical evidence, and ... defendant's credibility was undermined by his own inherently improbable testimony denying any connection to the murder"); *Fayson v. State,* 726 N.E.2d 292, 295 (Ind.2000) (concluding admission of co-defendant's incriminatory statement harmless beyond a reasonable doubt

because eyewitness testified to the defendant's involvement and, "significantly," the defendant admitted his involvement to another witness, despite the fact that the defendant testified and denied both committing the crime and making the admission of guilt). We also concluded in *Ross* that a Confrontation Clause violation was harmless because the erroneously admitted statement was cumulative to some evidence and corroborated by other evidence. 122 N.M. at 27, 919 P.2d at 1092. I believe the same conclusion we reached in *Ross* applies in the instant case. Defendant's denial of involvement in the crimes is uncorroborated, self-serving, not fully exculpatory, impeached by two of his own prior statements, and factually improbable. As in *Ross,* given the other evidence introduced by the State, Defendant's testimony is not substantial conflicting evidence for purposes of harmless error.

{68} The jury's task in this case was not as difficult as it would be in most murder cases tried before a jury. Defendant's own testimony established that Defendant was at the scene of the crime, that he arrived at the scene with an undisputed perpetrator of the crime and had a discussion with this individual about the crime before it occurred, and that he was aware that his cohort was armed with a gun. It was also undisputed that Defendant chose to remain in the room during the robbery despite prior knowledge of Coley's intent, an awareness that Coley had a gun, and the same opportunity to leave exercised by Hoff. The only question for the jury was whether, while voluntarily in the room with his gun-wielding friend during the robbery, Defendant participated in the crime. There was an abundance of evidence heard by the jury supporting Defendant's complicity with Coley, including an eyewitness's testimony that he initiated the robbery, a confession of guilt from Defendant, powerful evidence of a consciousness of guilt, and eyewitness testimony from two witnesses of Defendant's behavior after the fact being consistent with his participation in the crime. All of this evidence was actually heard by the jury and is not a hypothetical pattern of evidence constructed after the fact. The harmless error standard established by the Supreme Court requires that

we examine the evidence actually presented to the jury to determine whether a hypothetical, rational jury would have reached the same verdict without the introduction of Young's statement. Under this standard, I believe the State has established beyond a reasonable doubt that a rational jury would have reached the same verdict in the absence of Young's statement. I would therefore affirm Defendant's convictions of felony murder and conspiracy and respectfully dissent from the majority's holding to the contrary.