164 P.3d 966 (2007)
2007-NMCA-095
STATE of New Mexico, Plaintiff-Appellee,
v.
Edward VERDUGO, Defendant-Appellant.
No. 25,534.
Court of Appeals of New Mexico.
May 23, 2007.
Certiorari Granted July 20, 2007.
*968 Gary K. King, Attorney General, Patricia Gandert, Assistant Attorney General, Santa Fe, NM, for Appellee.
John Bigelow, Chief Public Defender, Susan Roth, Assistant Appellate Defender, Santa Fe, NM, for Appellant.
Certiorari Granted, No. 30,467, July 20, 2007.

OPINION
ROBINSON, Judge.
{1} Edward Verdugo (Defendant) appeals his convictions for robbery and attempt to commit unauthorized use of an ATM card of another. Defendant contends that he did not receive a fair trial because he was denied his ability to present a defense, and that his statements to police were taken in violation of his constitutional rights and improperly admitted into evidence. We hold that the district court misapplied the law, and that Defendant's Fifth Amendment rights were violated when the district court ruled that the incomplete Miranda warnings were sufficient. We further hold that admitting Defendant's statement was not harmless beyond a reasonable doubt. Because the Miranda issue is dispositive, we need not address Defendant's other issues. However, because Defendant would be entitled to dismissal of the charges if the evidence is insufficient to support them, we address Defendant's challenge to the sufficiency of the evidence issue. We hold that there is sufficient evidence to support the convictions.
I. FACTUAL AND PROCEDURAL BACKGROUND
{2} A grand jury indicted Defendant on charges of robbery and attempt to commit unauthorized use of an ATM card of another. The record reveals that at trial Corinna Klinger testified that on June 23, 2004, around 6:00 p.m., she was walking to her car in the parking lot of a mall where she worked, when she noticed a white four-door sedan driving slowly behind her. The car came up beside her, and a man reached out of the car, and grabbed her purse from her arm. Klinger testified that she was looking at the man while she was struggling to hold on to her purse. She made an in-court identification of Defendant as the person who grabbed her purse.
{3} Klinger further testified that after her purse was taken, she returned to the mall, and another individual called the police to report the incident. She testified that she spoke to Officer Cindy McCants at the scene, and gave a general description of the man who grabbed her purse. She told the officer that the car Defendant was in had a New Mexico license plate, but that she could only remember the first couple of letters of the license plate. She testified that her purse contained her wallet, driver's license, credit cards, an ATM card from Fort Bliss Federal Credit Union, personal belongings, and some cash. She also testified that she told detectives that the man had hairy arms, and was wearing a cutoff T-shirt. Her description to police did not mention anything about the person having a beard, goatee, ponytail, or tattoos. A few days after the incident, she met with police, and identified Defendant from an array of photographs shown to her. She testified that the photograph she selected was a photograph of Defendant, and she identified Defendant in the courtroom.
{4} Officer Rob Peterson also testified. The officer testified that he received a call on June 26 about a suspicious vehicle near the Pic Quik in Mesilla. When he arrived at the Pic Quik, he saw a vehicle on the adjacent street matching the description he had been given. He stopped the vehicle, which was being driven by its owner and discovered *969 that Defendant was a passenger in the car. Valdez was arrested for an outstanding warrant, and Defendant was allowed to leave. When Officer Peterson conducted an inventory search of the vehicle, he found Klinger's driver's license. The officer also testified that the vehicle matched the description of the white, four-door sedan previously given by Klinger.
{5} Lorraine Campos testified next. She testified that she is a supervisor at the Fort Bliss Federal Credit Union. The credit union keeps a videotape of ATM transactions. Campos testified that in late June, Detective Jeff Ferguson came to the credit union and said that he needed to review the video for the Fort Bliss ATM machine and the log of the cards that were retained from the machine on June 23. She testified that an ATM machine may retain a card for several reasons, such as when a person uses the wrong pin number three times, or when a card has been flagged as lost or stolen. Campos testified that Klinger's card was retained in the machine, and the card was destroyed on June 28. During her testimony, the State played a videotape, which revealed that someone tried to use the ATM machine at a time that corresponded with the time that Klinger's card was retained by the machine. The defense attempted to admit into evidence Defendant's own Fort Bliss ATM card to show that Defendant could have been using his own ATM card. The district court did not allow its admission because apparently the records requested from Campos by defense counsel had not been prepared for trial.
{6} Detective Larry Palos testified that he was contacted by Detective Jeff Ferguson, and was asked to help in the robbery investigation. He testified that he prepared photographs of suspects to show to Klinger for her identification. He also testified that he interviewed Defendant in his office while Defendant was in police custody regarding the robbery investigation. He testified that at first Defendant denied any involvement in the use of Klinger's ATM card, but then he admitted that he did go to the ATM, that he put Klinger's card into the ATM, and that the machine "ate" the card. However, Defendant denied any involvement in the robbery.
{7} Detective Ferguson testified next. He testified that he was assigned as the lead detective to investigate the robbery. He testified that he was in contact with Officer Peterson. Detective Ferguson testified that he was aware that evidence had been found in the car that Officer Peterson stopped that might relate to the robbery, and that the car was associated with Defendant. Further, he testified that, during the course of the investigation, he spoke with Terry Marquez, who had a personal relationship with Defendant, and who owned a white, four-door Mitsubishi with a New Mexico license plate.
{8} Detective Ferguson also testified about the circumstances of going to the Fort Bliss Federal Credit Union, approximately a week after the robbery, and reviewing a videotape of ATM transactions that occurred after Klinger's purse was stolen. He testified that he investigated the ATM machine at the credit union because Klinger's ATM card was issued by Fort Bliss, he knew that it was an ATM that was used, and he knew that the machine had cameras that videotaped transactions. He testified that the videotape of the transaction in which Klinger's ATM card was accessed showed that, on June 23 around 7:40 p.m., a heavy-set man with tattoos on his arms used the machine, and there was a white car in the background during the time the transaction occurred. Defendant was then asked to show the jury his forearms, which were tattooed. Detective Ferguson also testified about Marquez's car and her statements to him.
{9} The jury deliberated and found Defendant guilty of robbery and attempt to commit unauthorized use of an ATM card of another.
II. DISCUSSION
A. Failure to Give Defendant Complete Miranda Warnings
{10} A few months before trial Defendant filed a motion to suppress his statements made to Detective Palos, in which he stated that he attempted to use Klinger's ATM card at the Fort Bliss ATM machine, and that the machine "ate" the card. After a *970 hearing, the district court issued an order denying Defendant's motion to suppress his statements. The district court found that Defendant knew his Miranda rights, and that his statements to Detective Palos were voluntary and should not be suppressed. Defendant's statements were given to Detective Palos during custodial interrogation while Defendant was handcuffed and, therefore, Defendant was entitled to have his Miranda rights read to him. The detective asked Defendant if he knew his rights, and Defendant responded that he did. The detective then asked Defendant if he understood that he had the right to remain silent, and that he had a right to counsel. Defendant interrupted, and said that he understood his rights. The detective made no further attempts to inform Defendant of his complete Miranda warnings, and instead proceeded to question him. Specifically, the record of the suppression hearing reflects that the detective did not inform Defendant that an attorney would be provided to him if he could not afford one, and that any statements Defendant made could be used as evidence against him. Although we note that at trial the detective stated that he told Defendant that anything he said could and would be used against him, there is no indication whatsoever that the detective told Defendant that an attorney would be provided to him if he could not afford one.
{11} Defendant argues on appeal that his statement to Detective Palos should have been suppressed because incomplete Miranda warnings were given to him at the beginning of his custodial interrogation in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant contends that the district court misapplied the law when it ruled that the incomplete Miranda warnings were sufficient. Defendant further argues that Miranda requires that a suspect be informed of all his rights, and the fact that a defendant says that he is aware of his rights prior to being advised does not excuse the failure to give complete Miranda warnings. The State asserts that Defendant waived his Miranda rights because the detective began to read Defendant his Miranda warnings, but was interrupted by Defendant, who said that he understood his rights. Therefore, the State contends that the district court properly denied Defendant's motion to suppress, and Defendant's statements to the detective were properly admitted into evidence.
{12} In determining whether Defendant's motion to suppress was properly denied, we decide whether the law was properly applied to the facts, viewing the facts in the light most favorable to the State as the prevailing party, indulging all reasonable inferences in support of the trial court's ruling, and disregarding all evidence and inferences to the contrary. See State v. Jason L., 2000-NMSC-018, ¶ 10, 129 N.M. 119, 2 P.3d 856; State v. Joe, 2003-NMCA-071, ¶ 6, 133 N.M. 741, 69 P.3d 251. "[W]e review mixed questions of law and fact de novo, particularly when they involve constitutional rights." State v. Hernandez, 1997-NMCA-006, ¶ 18, 122 N.M. 809, 932 P.2d 499; see State v. Barrera, 2001-NMSC-014, ¶ 23, 130 N.M. 227, 22 P.3d 1177 (stating that, "[o]n appeal, we review the trial court's findings of fact for substantial evidence and review de novo the ultimate determination of whether a defendant validly waived his or her Miranda rights prior to police questioning"); see also United States v. Connell, 869 F.2d 1349, 1351 (9th Cir.1989) ("Whether [the defendant] was given adequate Miranda warnings is a question of law that is reviewed de novo by the appellate court.").
{13} In Miranda, the United States Supreme Court held that law enforcement officers must inform suspects of certain fundamental constitutional rights prior to initiating custodial interrogation. See Miranda, 384 U.S. at 444, 86 S.Ct. 1602 (stating that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination"). Miranda holds that a suspect "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one *971 will be appointed for him prior to any questioning if he so desires." Id. at 479, 86 S.Ct. 1602. The defendant may waive these rights, provided that the waiver is made voluntarily, knowingly, and intelligently, "[b]ut unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." Id. That means the Miranda rights can only be waived by a defendant "[a]fter such warnings have been given." Id.; see Dupont v. United States, 259 A.2d 355, 358-59 (D.C.1969) (holding that the State failed to meet its burden of demonstrating a knowing and intelligent waiver of counsel during interrogation where defendant interrupted the officer before he was advised of his right to counsel by saying: "I know my rights, man"); see also Johnson v. Arkansas, 299 Ark. 223, 772 S.W.2d 322, 324 (1989) (holding that warning was sufficient where police failed to advise the defendant of his right to have counsel appointed if he was indigent, but the defendant stated, during the reading of the Miranda warnings, that "he did not want a public defender, and that whenever he needed or wanted an attorney he would hire his own," indicating that he was aware of the right); California v. Nitschmann, 35 Cal.App.4th 677, 41 Cal. Rptr.2d 325, 327-28 (1995) (holding that warnings were sufficient where the defendant interrupted the officer and recited the rights himself, reasoning that the defendant's self-admonition reasonably conveyed to the defendant his rights as required by Miranda); 2 Wayne R. La Fave, et al., Criminal Procedure § 6.8 (2d ed.1999) (stating that where a defendant interrupts an officer before he has been warned of all of his rights the "better view" is that a general declaration of knowing the rights "does not foreclose the need for specification of those rights by the police"). But see Nebraska v. Perez, 182 Neb. 680, 157 N.W.2d 162, 164 (1968) (holding that the defendant waived his rights under Miranda when he interrupted the officer and stated: "You don't have to advise me of my rights, I know more about them than you, I have been picked up and advised many times before").
{14} The State contends that because Defendant testified at the suppression hearing that he voluntarily gave statements to Detective Palos, and because Defendant told the detective that he understood his rights, Defendant knowingly and voluntarily waived his Miranda rights. We are not persuaded by this contention. See Michigan v. Mosley, 423 U.S. 96, 99-100, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975) (stating that a violation of procedures dictated by Miranda makes even wholly voluntary statements inadmissible); see also Connell, 869 F.2d at 1353 (reaching the conclusion that the Miranda warnings the defendant received were deficient because they were equivocal and open to misinterpretation in that the investigators told the defendant that he had the right to talk to an attorney before, during, and after questioning, and then asserted that such an attorney could not be obtained at the government's expense).
{15} The State is correct that New Mexico case law recognizes that the rights articulated in the Miranda warnings may be waived. For example, in State v. Gilbert, 98 N.M. 530, 534, 650 P.2d 814, 818 (1982), our Supreme Court recognized that:
[o]nce advised of his Miranda rights, an accused may himself validly waive his rights and respond to interrogation. Such a waiver must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case upon the particular facts and circumstances surrounding that case, including the background, experience and conduct of the accused.
Id. (internal quotation marks and citations omitted). That said, in every decision rendered by our state courts finding a valid waiver of Miranda rights, the facts revealed that complete Miranda warnings were given before the rights enunciated therein were waived. See generally State v. Reyes, 2002-NMSC-024, 132 N.M. 576, 52 P.3d 948 (finding waiver after Miranda warnings were given); Barrera, 2001-NMSC-014 (same); State v. Martinez, 1999-NMSC-018, 127 N.M. 207, 979 P.2d 718 (same); State v. Salazar, 1997-NMSC-044, 123 N.M. 778, 945 P.2d 996 (same); State v. Setser, 1997-NMSC-004, 122 N.M. 794, 932 P.2d 484 *972 (same); Gilbert, 98 N.M. 530, 650 P.2d 814 (same); State v. Rubio, 2002-NMCA-007, 131 N.M. 479, 39 P.3d 144 (same).
{16} We understand the State to argue that, pursuant to United States v. Patane, 542 U.S. 630, 124 S.Ct. 2620, 159 L.Ed.2d 667 (2004), a mere failure to give complete Miranda warnings does not, by itself, violate a suspect's constitutional rights, or even the Miranda rule. Therefore, the State argues that Defendant's statement was properly admitted. The State misconstrues Patane. In Patane, the defendant was indicted for being a felon in possession of a firearm based on the seizure of a gun found at the defendant's home during the course of his arrest for violating a restraining order. Id. at 635, 124 S.Ct. 2620. As in this case, the defendant in Patane interrupted a detective when he attempted to advise the defendant of his rights, and the defendant asserted that he knew his rights. Id. The defendant was then questioned about the firearm. Id. The defendant responded by telling the detective where the firearm was located and allowing the detective to retrieve it. Id. The case went to trial, and the government conceded that the defendant's answers to on-the-scene questioning were inadmissible at trial under Miranda, despite partial warnings and the defendant's assertions that he knew his rights. Patane, 542 U.S. at 635 n. 1, 124 S.Ct. 2620. However, the government wanted to admit the firearm into evidence at trial. See id. at 636-37, 124 S.Ct. 2620. The United States Supreme Court held that the failure to give complete Miranda warnings did not require suppression of evidence that was the physical fruit of a suspect's unwarned, but voluntary, statements. See id. The Court made it clear that Miranda is a prophylactic rule designed to protect against violation of the privilege against self-incrimination, which provides that no suspect will be compelled to testify against himself at a criminal trial. Id. The Court went on to state that potential Miranda "violations occur, if at all, only upon the admission of unwarned statements into evidence at trial." Id at 641, 124 S.Ct. 2620. A perceived Miranda violation is completely remedied by the exclusion of unwarned statements. Id. 641-42, 124 S.Ct. 2620.
{17} Unlike the situation in Patane, the State in this case was not attempting to have the physical fruit of Defendant's statements admitted into evidence. Instead, the State wished to admit Defendant's unwarned statements that he used Klinger's ATM card, and that the machine ate the card. This is precisely the type of evidence described in Patane as prohibited under the Miranda rule. Therefore, to the extent that the district court found that "Defendant knew his Miranda rights and that his statements to Detective Palos were voluntary and should not be suppressed[,]" the district court erred. (Emphasis added.) We hold that Defendant's Fifth Amendment privilege against compelled self-incrimination was violated by Defendant's statements to Detective Palos being admitted into evidence at trial. We further hold that while a defendant may waive the rights articulated in the Miranda warnings, a defendant cannot, as a matter of law, waive those rights before the reading of the Miranda warnings has been completed in full.
{18} Finally, we must determine the appropriate remedy for this constitutional error. Defendant argues that the convictions must be reversed. The State argues that reversal of Defendant's convictions is unnecessary because any error in the admission of Defendant's statements was harmless given the substantial evidence of guilt properly admitted at trial. We hold that, under the circumstances presented here, the admission of Defendant's statement was not harmless.
{19} The burden is on the State to establish that the constitutional error was "harmless beyond a reasonable doubt" pursuant to Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). See also State v. Johnson, 2004-NMSC-029, ¶ 8, 136 N.M. 348, 98 P.3d 998; State v. Alvarez-Lopez, 2004-NMSC-030, ¶ 25, 136 N.M. 309, 98 P.3d 699. Under the harmless beyond a reasonable doubt inquiry, if there is a "reasonable possibility" that the inadmissible evidence "might have" contributed to a defendant's conviction, the constitutional error is not harmless. Johnson, 2004-NMSC-029, ¶ 9; see also Alvarez-Lopez, 2004-NMSC-030, ¶ 25.
*973 {20} "In determining whether the error was harmless, we must be able to conclude beyond a reasonable doubt that the jury verdict would have been the same in the absence of the error by looking to the effect that the constitutional error had upon the guilty verdict in this particular case." See State v. Walters, 2006-NMCA-071, ¶ 39, 139 N.M. 705, 137 P.3d 645, cert. granted, 2006-NMCERT-006, 140 N.M. 226, 141 P.3d 1280. Constitutional error is not harmless simply because there was substantial evidence, in addition to an unconstitutionally obtained statement, to support the conviction. Id. The fact that overwhelming evidence of a defendant's guilt is otherwise present is not determinative because a criminal defendant has a constitutional right to have guilt or innocence decided by a jury, rather than by appellate court judges during review on appeal. Id. Therefore, notwithstanding the presence of overwhelming evidence of a defendant's guilt, we still examine whether there is a "reasonable possibility" that the erroneous evidence "might have" affected the jury's verdict. Johnson, 2004-NMSC-029, ¶¶ 9-11; Alvarez-Lopez, 2004-NMSC-030, ¶¶ 26-27, 30, 32. Unless the answer to this question is "no," the constitutional error is not harmless beyond a reasonable doubt.
{21} In Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991), the United States Supreme Court was faced with determining whether a criminal defendant's involuntary confession, which was unconstitutionally admitted into evidence against him at his trial, contributed to his conviction. In that case, the Court noted:
[C]onfessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so. . . . [T]he risk that the confession is unreliable, coupled with the profound impact that the confession has upon the jury, requires a reviewing court to exercise extreme caution before determining that the admission of the confession at trial was harmless.
Id. at 296, 111 S.Ct. 1246 (internal quotation marks and citations omitted); cf. Alvarez-Lopez, 2004-NMSC-030, ¶ 34 ("Like a defendant's own confession, the incriminating statements of an accomplice often have a profound impact on the jury's verdict.").
{22} Detective Palos testified that he read Defendant his Miranda rights, and that Defendant orally waived those rights. The detective also testified that Defendant said that he wanted to be truthful with him, and that he stated that he used Klinger's ATM card. We note that the district court instructed the jury that, if it did not find that Defendant's statements were voluntarily given, the jury should disregard the statements. However, the record does not reflect that the jury was informed that the detective did not give Defendant complete Miranda warnings.
{23} In addition to Detective Palos' testimony, the State brought up Defendant's statement during its closing argument, stating that he admitted that he used Klinger's ATM card. Moreover, in its rebuttal argument, the State emphasized that Defendant admitted to using Klinger's ATM card. The State told the jury that Defendant "admitted it. He admitted it. So he admitted the ATM. We go back in logic and we find out he is in the car where the driver's license is found. The driver's license is inside the purse. The purse was stolen at the robbery at the mall. That links [Defendant] to [the robbery]."
{24} Under the facts and circumstances of this case, we hold that allowing Detective Palos to testify that Defendant told him that he went to the Fort Bliss ATM, that he did put Klinger's card into the ATM, and that the machine ate the card was not harmless beyond a reasonable doubt. Although there was other evidence that linked Defendant to the robbery and the ATM transaction, the jury could not realistically be expected to ignore Defendant's statement, particularly because the prosecutor linked the two crimes based on Defendant's admission that he used Klinger's ATM card. We cannot conclude there is no reasonable possibility that Defendant's statement could have contributed to the guilty verdicts of Defendant. Therefore, we hold that the constitutional error committed in this case was not harmless, and Defendant's convictions must be reversed.
*974 B. Sufficiency of the Evidence
{25} Defendant contends that the evidence was insufficient to support his convictions. In reviewing the sufficiency of the evidence in a criminal case, we must determine whether substantial evidence, either direct or circumstantial, exists to support a verdict of guilty beyond a reasonable doubt for every essential element of the crime at issue. See State v. Rojo, 1999-NMSC-001, ¶¶ 19, 23, 126 N.M. 438, 971 P.2d 829. The evidence is reviewed in the light most favorable to the verdict, resolving all conflicts, and indulging all permissible inferences to uphold the conviction, and disregarding all evidence and inferences to the contrary, to ensure that a rational jury could have found each element of the crime established beyond a reasonable doubt. Id. Finally, we observe that it is for the fact finder to evaluate the weight of the evidence, to assess the credibility of the various witnesses, and to resolve any conflicts in the evidence. We will not substitute our judgment as to such matters. See State v. Roybal, 115 N.M. 27, 30, 846 P.2d 333, 336 (Ct.App.1992). Based on the foregoing standard of review, we conclude that sufficient evidence supported Defendant's convictions.
{26} In order to convict Defendant of robbery, the State had to prove beyond a reasonable doubt that (1) Defendant took and carried away a purse from Klinger, or from her immediate control, intending to permanently deprive her of the purse; (2) the purse and the contents had value; and (3) Defendant took the purse by force. See NMSA 1978, § 30-16-2 (1973) ("Robbery consists of the theft of anything of value from the person of another or from the immediate control of another, by use or threatened use of force or violence."); see also UJI 14-1620 NMRA.
{27} In this case, Klinger identified Defendant in court, and testified that Defendant was inside a white car that drove up along side her while she was walking in a parking lot, and that he grabbed her purse from her arm. She testified that she struggled to retain control of the purse, but that the strap eventually broke. Klinger also testified that the purse and its contents had value. In addition, Officer Peterson testified that Klinger's driver's license, which was in the purse, was found during an inventory search of a vehicle in which Defendant was a passenger. This provided sufficient evidence to sustain a conviction for robbery.
{28} In order to convict Defendant of attempt to commit unauthorized use of an ATM card of another, the State had to prove beyond a reasonable doubt that (1) Defendant intended to commit the crime of unauthorized use of an ATM card; and (2) Defendant began to do an act, which constituted a substantial part of the unauthorized use of an ATM card, but failed to commit the unauthorized use of an ATM card. See NMSA 1978, § 30-28-1 (1963) (explaining what constitutes attempt). The jury was also instructed that, in order to commit the crime of unauthorized use of an ATM card, the State had to prove beyond a reasonable doubt that (1) Defendant used an ATM card to make an unauthorized withdrawal; and (2) Defendant did not have permission from the authorized card holder to use the ATM card. NMSA 1978, § 58-16-16(B) (1990) (stating that "[a]ny person who makes an unauthorized withdrawal from the account of another person with a financial institution, or who steals the card of another, or who makes an unauthorized use of the card of another is guilty of a fourth-degree felony").
{29} In this case, sufficient evidence supported the conviction of attempt to commit unauthorized use of an ATM card of another. The State introduced a videotape of the transaction in which Klinger's card was inserted into the Fort Bliss ATM machine. The videotape and stills from the tape showed that the person using the ATM machine had tattoos on his arms, and the jury was able to compare the stills with the tattoos on Defendant's arms. Also, several days after the robbery, Defendant was stopped in a vehicle in which Klinger's driver's license was found. In addition, the State introduced Defendant's statement to Detective Palos into evidence at trial, in which Defendant stated to the detective that he tried to use Klinger's ATM card, but the machine ate it. See State v. Post, 109 N.M. 177, 181, 783 P.2d 487, 491 (Ct.App.1989) *975 (recognizing that, in reviewing the sufficiency of the evidence, the appellate court looks at all evidence admitted, including wrongfully admitted evidence). Viewing the foregoing evidence in the light most favorable to the convictions, and disregarding all evidence and inferences to the contrary, we hold that the evidence reviewed above is sufficient to convict Defendant of robbery and attempt to commit unauthorized use of an ATM card of another.
{30} "We do not address any of the other issues raised. An advisory opinion resolves a hypothetical situation that may or may not arise[,]" and Defendant's evidentiary issues raised on appeal may not arise again in Defendant's new trial. Walters, 2006-NMCA-071, ¶ 51.
III. CONCLUSION
{31} Defendant's convictions are reversed, and this case is remanded with instructions to grant Defendant a new trial.
{32} IT IS SO ORDERED.
WE CONCUR: JONATHAN B. SUTIN, Chief Judge and A. JOSEPH ALARID, Judge.