# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2019-NMSC-014

Filing Date: July 18, 2019

NO. S-1-SC-36859

STATE OF NEW MEXICO,

      Plaintiff-Appellee,

v.

MANUEL BACA,

      Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SOCORRO COUNTY**
**Matthew G. Reynolds, District Judge**

Released for Publication September 24, 2019.

Bennett J. Baur, Chief Public Defender
Steven James Forsberg, Assistant Appellate Defender
Albuquerque, NM

for Appellant

Hector H. Balderas, Attorney General
Lauren Joseph Wolongevicz, Assistant Attorney General
Santa Fe, NM

for Appellee

## OPINION

**THOMSON, Justice.**

**{1}**    The State charged Defendant Manuel Baca with an open count of murder by criminal complaint. The district court found by clear and convincing evidence that Defendant committed first-degree murder and determined that he was dangerous and not competent to stand trial. The district court ordered Defendant detained by the New Mexico Department of Health (Department) pursuant to NMSA 1978, Section 31-9-1.5(D) (1999). Defendant appeals that order, contesting the sufficiency of the evidence. Although Defendant has not been convicted of first-degree murder, Defendant

nonetheless faces lifetime detention by the State. We therefore determine that jurisdiction properly lies in this Court, and we affirm the district court.

## I.    BACKGROUND

**{2}**    Defendant's father Fidel Baca Sr. (Fidel) played guitar at a local funeral near Socorro during the day on January 6, 2016, and on his way home, Fidel stopped by the home of Fidel Baca Jr. (Junior) to retrieve groceries that Junior had picked up for him. Fidel did not stay long. He said that he was tired and wanted to rest but that he might come by later to have a beer and visit if he felt better. Fidel did not return to Junior's home.

**{3}**    Later that evening Defendant showed up at Junior's home. Defendant was "aggravated and mad, agitated" and asked, "Have you seen him?" Junior assumed Defendant meant Fidel. When Junior reached out to pet Fidel's dog, which Defendant had tucked in his sweatshirt, Defendant knocked Junior's hand away and said, "Don't touch the fucking dog." Defendant also asked for keys to Fidel's home. Junior told Defendant to leave and to not come around when he was high, and Junior did not give Defendant the keys. Defendant left and walked down the road to Fidel's mobile home. Junior tried to call Fidel to warn him that Defendant "was acting crazy again" but never got a response. Since Defendant did not have a key, he picked the front lock to get into Fidel's mobile home. A neighbor said he thought about going over to check on Fidel when he noticed in the middle of the night that a light was on in Fidel's living room, which was unusual, but he did not check on Fidel.

**{4}**    The next morning officers from the Socorro Police Department responded to an "unknown medical" call from Fidel's home. A neighbor directed officers to Fidel's mobile home at the end of the road, where Defendant sometimes lived with his father. Defendant answered the door to the mobile home and told the officers, "He's over there." Officers discovered Fidel lying face up on the floor with an almost-four-foot-long, twenty-pound pickaxe stuck in his chest.

**{5}**    The State charged Defendant with an open count of murder by criminal complaint. Before the scheduled preliminary examination the prosecutor raised the issue of Defendant's competency, and the magistrate court transferred the case to the district court. *See* NMSA 1978, § 31-9-1 (1993). The district court entered a stipulated order to commit Defendant to the Department for up to nine months of treatment to attain competency to stand trial.

**{6}**    Following the treatment period and a subsequent hearing on the merits, the district court ordered Defendant to be detained by the Department for life and, as required by statute, ordered an evaluation at least every two years to determine "trial competency and dangerousness." *See* § 31-9-1.5(D)(2), (4) (providing for such criminal commitment up to the "maximum sentence to which the defendant would have been subject had the defendant been convicted in a criminal proceeding" and for review hearings "at least every two years" where "the court shall enter findings on the issues of

trial competency and dangerousness"); *see also* NMSA 1978, § 30-2-1(A) (1994) (providing that a "willful, deliberate and premeditated killing" is "a capital felony"); NMSA 1978, § 31-18-14 (2009) ("When a defendant has been convicted of a capital felony, the defendant shall be sentenced to life imprisonment or life imprisonment without possibility of release or parole."). Defendant appeals from the order of commitment.

## II.     DISCUSSION

### A.     The Appeal of a Lifetime Criminal Commitment Pursuant to Section 31-9-1.5 (Section 1.5) Properly Lies with This Court

**{7}**     In their original filings, neither party addressed jurisdiction. This is understandable given that this Court in *State v. Adonis*, 2008-NMSC-059, ¶¶ 5, 7, 145 N.M. 102, 194 P.3d 717, accepted a transfer from the Court of Appeals of the appeal of a Section 1.5 hearing where the district court had ordered the defendant committed for life. While this Court's acceptance of the transfer determined our jurisdiction in *Adonis*, it did not clarify where jurisdiction properly lies in subsequent cases. Our acceptance of the transfer in *Adonis* constituted a final determination of jurisdiction only for that appeal. *See* NMSA 1978, § 34-5-10 (1966) ("Any transfer under this section is a final determination of jurisdiction. Whenever either court determines it has jurisdiction in a case filed in that court and proceeds to decide the matter, that determination of jurisdiction is final."). Because we have not clearly addressed the jurisdiction question, we asked the parties to file supplemental briefs on the appropriate mechanism for the review of lifetime commitments pursuant to the New Mexico Mental Illness and Competency Code (MICC), NMSA 1978, §§ 31-9-1 to -2 (1967, as amended through 1999).

**{8}**     When the State charges a defendant with an enumerated violent felony, the district court may conduct a civil hearing pursuant to Section 1.5 if it has determined that the defendant is incompetent to stand trial and that there is not a substantial probability that the defendant will become competent within a reasonable period. *See* § 31-9-1.4(A). At the Section 1.5 hearing, "[t]he state and the defendant may introduce evidence relevant to the question of the defendant's guilt of the crime charged." Section 31-9-1.5(A). If the district court finds by clear and convincing evidence that the defendant committed the crime and is presently incompetent and dangerous, "the defendant shall be detained by the [D]epartment . . . in a secure, locked facility." Section 31-9-1.5(D)(1). The term of this detention, or criminal commitment, may equal the maximum sentence to which the defendant would have been subject *if convicted* in a criminal proceeding. Section 31-9-1.5(D)(1)-(2).

**{9}**     Although we differentiate a detention ordered pursuant to Section 1.5 from an involuntary civil commitment ordered under the Mental Health and Developmental Disabilities Code, NMSA 1978, §§ 43-1-1 to -25 (1977, as amended through 2016), by

calling it a "criminal commitment," neither order comes from a criminal prosecution.[1] *Compare State v. Rotherham*, 1996-NMSC-048, ¶¶ 53-56, 122 N.M. 246, 923 P.2d 1131 (observing that a finding under Section 1.5 of clear and convincing evidence that an incompetent defendant committed the crime charged justifies further detention for treatment to attain trial competency and to protect the defendant and society in general and that such detention is not punitive), *with State v. Clayton*, 1981-NMCA-018, ¶¶ 9, 18, 36, 95 N.M. 644, 625 P.2d 99 (affirming the residential placement of developmentally disabled adults based on the district court's finding under Section 43-1-13(E) (1978) of clear and convincing evidence that the residential services are in the adults' "best interests" and are consistent with the "least drastic means").

{10}    Generally, the Court of Appeals has jurisdiction in appeals from Section 1.5 proceedings. *See* NMSA 1978, § 34-5-8(A)(1) (1983) (providing appellate jurisdiction in civil actions not specifically reserved for this Court). But unlike the Mental Health Code, which specifically confers jurisdiction over the appeal of a civil commitment to the Court of Appeals, *see* § 43-1-24, the MICC does not statutorily establish appellate jurisdiction. Before *Adonis*, defendants appealed orders of commitment following a Section 1.5 hearing to the Court of Appeals. *See, e.g.*, *State v. Taylor*, 2000-NMCA-072, ¶¶ 1, 18, 26, 129 N.M. 376, 8 P.3d 863 (reversing the district court's criminal commitment to detention for the life of an incompetent defendant based on insufficient evidence to support the charge of first-degree murder); *State v. Webb*, 1990-NMCA-077, ¶¶ 8-13, 111 N.M. 78, 801 P.2d 660 (analyzing when a detention under the MICC would trigger the right to appeal and dismissing the appeal for lack of jurisdiction where the orders of commitment appealed from were not the final orders of the district court).

{11}    The question of jurisdiction in this case potentially affects only a limited number of appeals from an order of lifetime commitment under the MICC. But because the deprivation of liberty resulting from a lifetime criminal commitment is equivalent to the deprivation of liberty under a lifetime sentence, we recognize the jurisdiction conferred on this Court by Article VI, Section 2 of the New Mexico Constitution. Lifetime detention is a denial of the right to enjoy life and liberty under Article II, Section 4 of the New Mexico Constitution, regardless of whether the detention results from a criminal or a civil proceeding.

{12}    In *Adonis*, this Court relied on the jurisdictional analysis in *State v. Smallwood*, 2007-NMSC-005, ¶ 10, 141 N.M. 178, 152 P.3d 821, in accepting the transfer of a defendant's appeal of his Section 1.5 criminal commitment for life. *See Adonis*, 2008-NMSC-059, ¶ 7. *Smallwood* held that "the legislature intended for us to have jurisdiction over interlocutory appeals in situations where a defendant may possibly be sentenced to life imprisonment or death." 2007-NMSC-005, ¶ 11. Nevertheless, the appeal of a commitment pursuant to Section 1.5 is not an interlocutory appeal in a criminal case. *See* NMSA 1978, § 39-3-3(A) (1972) (establishing specifically when, relative to the district court order appealed from, and how an interlocutory appeal in a criminal case

---

[1]We note that Section 1.5 does not use the term *criminal commitment*. However, prior case law refers to a detention by the Department pursuant to Section 1.5 as a *criminal commitment*, and the term is in common use to distinguish it from *civil commitment*. We use both terms in this opinion.

may be taken). In fact, the MICC indefinitely suspends the criminal case for the entire proceeding and criminal commitment. *See* § 31-9-1 (providing for suspension of the criminal case until the issue of competency is determined); *see also* § 31-9-1.5(D)(4) (providing for suspension of the criminal case until (a) "the defendant is competent to proceed in [the] criminal case" or (b) "the period of commitment equal[s] the maximum sentence to which the defendant would have been subject"). Although accepting transfer of the appeal resolved the issue in *Adonis*, our reliance on *Smallwood* was unnecessary.

**{13}** We do not acquire jurisdiction in appeals from Section 1.5 proceedings by analogy to a criminal interlocutory appeal. Instead, the New Mexico Constitution directly establishes our jurisdiction because the potential lifetime deprivation of liberty is equivalent to a life sentence. N.M. Const. art. VI, § 2 ("Appeals from a judgment of the district court imposing a sentence of death or life imprisonment shall be taken directly to the supreme court."). As the United States Supreme Court explained, "It is clear that 'commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.'" *Jones v. United States*, 463 U.S. 354, 361 (1983) (quoting *Addington v. Texas*, 441 U.S. 418, 425 (1979)). This Court further acknowledged, "It is indisputable that commitment pursuant to Section 31-9-1.5 results in a loss of liberty." *Rotherham*, 1996-NMSC-048, ¶ 51. *Rotherham* correctly differentiates a Section 1.5 hearing from a criminal prosecution: A criminal prosecution "establishes criminal liability for purposes of rendering punishment" while a Section 1.5 hearing determines "whether the defendant committed the criminal act" but does not focus on criminal liability.[2] *Rotherham*, 1996-NMSC-048, ¶ 54. However, as Justice Minzner cautioned, because Section 1.5 potentially provides for the indefinite suspension of the criminal case, the criminal commitment might at some point "amount to punishment." *See Rotherham*, 1996-NMSC-048, ¶ 79 (Minzner, J., specially concurring) (observing that a potential substantive due process violation arises where a defendant who cannot be treated to competency and does not receive proper treatment to alleviate the defendant's dangerousness is detained for a life commitment under Section 1.5). If the statute's release provisions are never triggered, the treatment facility is potentially transformed "'into a penitentiary where one could be held indefinitely for no convicted offense.'" *Rotherham*, 1996-NMSC-048, ¶ 80 (Minzner, J., specially concurring) (citation omitted); *see also State v. Lopez*, 2009-NMCA-112, ¶ 12, 147 N.M. 279, 219 P.3d 1288 ("The involuntary nature of commitment and the associated loss of liberty is the key aspect of commitment constituting 'official confinement' equivalent to a sentence based on a conviction." (citation omitted)).

**{14}** The State surmises that although a criminal commitment under Section 1.5 is not a criminal conviction, "it is probable that a defendant . . . will remain detained for life." The State postulates that the district court finding of dangerousness, along with its

---

[2]*Rotherham* made this distinction when it analyzed the constitutionality of the clear and convincing standard of evidence used as required in Section 1.5 to determine that the defendant committed the crime. *See id.* ¶¶ 49-56 (following *Addington*, 441 U.S. at 432-33 (establishing the constitutional minimum standard for an involuntary commitment proceeding as "greater than the preponderance-of-the-evidence standard applicable to other categories of civil cases")).

determination that Defendant committed the felony, "makes a future finding of a lack of dangerousness unlikely." We must remain mindful that a prior determination that a defendant *was dangerous* does not establish that a defendant *continues to be dangerous*. Indefinitely holding a pending criminal charge over the head of a defendant "who will never have a chance to prove his innocence" is an inherent denial of due process. *Jackson v. Indiana*, 406 U.S. 715, 740 (1972). The State should not view a criminal commitment as an alternative to criminal prosecution but rather as a means to protect the community from danger and as a commitment for treatment. *See Rotherham*, 1996-NMSC-048, ¶¶ 52-54; *see also id.* ¶ 79 (Minzner, J., specially concurring) ("[A]s a matter of substantive due process, those involuntarily committed under Section 31-9-1.5 have a right to be treated not only for competency, but to alleviate their dangerousness and accompanying mental illness or disability.").

{15}    In addition, the direct appeal from the Section 1.5 hearing is the only time an appellate court would properly review the merits of the evidence presented in that hearing on the crime charged—and the defendant has a constitutional right to such review. *See Webb*, 1990-NMCA-077, ¶¶ 8-9 (observing that a finding of sufficient evidence made in a Section 1.5 hearing satisfies the standard for a determination on the merits for purposes of an appeal); N.M. Const. art. VI, § 2 (providing "that an aggrieved party shall have an absolute right to one appeal"). Any subsequent appeal of a review hearing would not address the merits of the evidence on the suspended charges. *See* § 31-9-1.5(D)(4) (limiting the review hearings required pursuant to a Section 1.5 commitment to issues of the committed defendant's trial competency and continuing dangerousness). The appeal before us is Defendant's one appeal of the Section 1.5 district court finding that Defendant committed murder in the first degree.

{16}    The question of jurisdiction in this context takes on significance because, as noted above, the suspended-but-pending criminal charge of first-degree murder effectively subjects Defendant to a life sentence from which *the only direct appeal* on the sufficiency of the evidence against Defendant may be from the initial Section 1.5 hearing. *See* N.M. Const. art. VI, § 2 (providing that "an aggrieved party shall have an absolute right to one appeal"); *see also* § 31-9-1.5(D)(2) (providing that the commitment term is "equal to the maximum sentence to which the defendant would have been subject had the defendant been convicted in a criminal proceeding"). Where a defendant may be committed for life, arguing that such a commitment is not equivalent to a judgment imposing a life sentence draws a distinction without a difference.[3] Our jurisdiction is proper under Article VI, Section 2 of the New Mexico Constitution.

---

[3]Although it is not necessary to our holding, we observe that the State must credit Defendant for presentence confinement while committed, which informs our analysis and further supports our decision. *See State v. La Badie*, 1975-NMCA-032, ¶¶ 5, 14, 87 N.M. 391, 534 P.2d 483 (holding that an incompetent defendant committed to a mental health facility based on felony charges in a suspended criminal case must be given credit for presentence confinement); *see also Lopez*, 2009-NMCA-112, ¶ 12 ("The involuntary nature of commitment and the associated loss of liberty is the key aspect of commitment constituting 'official confinement' equivalent to a sentence based on a conviction within the meaning of [NMSA 1978,] Section 31-20-12 [(1977)].""). "A person held in official confinement on suspicion or charges of the commission of a felony shall, upon conviction of that or a lesser

**B.    The Evidence Was Sufficient to Establish That the Murder Was Willful, Deliberate, and Premeditated**

**{17}**    On appeal, the defense has conceded that Defendant killed Fidel. We review Defendant's claim that evidence was not sufficient to ensure that substantial evidence supports the district court's determination that Defendant killed Fidel with the deliberate intention to end his life without lawful justification or excuse. *See Adonis*, 2008-NMSC-059, ¶ 12 (providing that the sufficiency review must ensure that a rational fact finder "*could have* found . . . the essential facts required" (omission in original)); *see also* § 30-2-1(A)(1) ("Murder in the first degree is the killing of one human being by another without lawful justification or excuse . . . by any kind of willful, deliberate and premeditated killing."). A willful, deliberate, and premeditated killing is killing with "'the deliberate intention to take away the life of another.'" *State v. Garcia*, 1992-NMSC-048, ¶ 17, 114 N.M. 269, 837 P.2d 862 (citation omitted). "Deliberate intent may be inferred from the particular circumstances of the killing as proved by the State through the presentation of physical evidence." *State v. Duran*, 2006-NMSC-035, ¶ 8, 140 N.M. 94, 140 P.3d 515. "Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. "In reviewing the sufficiency of the evidence to support [a d]efendant's commitment for first-degree murder, we must be careful not to substitute our judgment for that of the district court." *Adonis*, 2008-NMSC-059, ¶ 12.

**{18}**    In order to have the incompetent Defendant criminally committed, the State was required to prove by clear and convincing evidence that Defendant committed the criminal acts charged. Section 31-9-1.5(D). "'Clear and convincing evidence is evidence that instantly tilt[s] the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.'" *Adonis*, 2008-NMSC-059, ¶ 11 (alteration in original) (quoting *In re Locatelli*, 2007-NMSC-029, ¶ 7, 141 N.M. 755, 161 P.3d 252). The State was required to establish every element of the crime, including specific intent, to the clear and convincing standard. *Taylor*, 2000-NMCA-072, ¶¶ 17-19.

**{19}**    The State must therefore establish mens rea by clear and convincing evidence, and Defendant in this "Section []1.5 hearing may not attempt to disprove specific intent by relying on a lack of mental capacity to form the intent required to commit the crime." *Adonis*, 2008-NMSC-059, ¶ 18. As we have stated, a Section 1.5 hearing is not a criminal prosecution. *See Rotherham*, 1996-NMSC-048, ¶¶ 53-54. Instead, a Section 1.5 hearing permits the State to detain a defendant for treatment within the bounds of the federal and state constitutions if that defendant is incompetent and dangerous and has committed an enumerated criminal act. *See State v. Werner*, 1990-NMCA-019, ¶ 11, 110 N.M. 389, 796 P.2d 610. This maintains the balance between competing interests and allows a defendant to utilize defenses of insanity or the lack of mental capacity if the defendant ultimately faces criminal prosecution.

---

included offense, be given credit for the period spent in presentence confinement against any sentence finally imposed for that offense." Section 31-20-12.

**{20}** Defendant's briefing in this appeal primarily presents evidence that because of his "delusional frenzy" Defendant could not have formed specific intent. *See Taylor*, 2000-NMCA-072, ¶ 13 (observing that both parties may offer evidence regarding the defendant's state of mind regardless of the availability of specific defenses). Defendant "follows the path specifically mapped out in *Taylor*" in arguing that the State failed to prove specific intent by clear and convincing evidence. *See Adonis*, 2008-NMSC-059, ¶ 18. Like *Adonis*, Defendant argues that the State failed to meet its burden to prove deliberation, relying in large part on evidence similar to what Defendant would likely use to argue a lack of mental capacity and to a great extent on witness testimony which, the State has argued, supports deliberation. Defendant cites *Taylor*, 2000-NMCA-072, ¶ 22, to argue that a speculative temporal period between arming himself with the pickaxe and the killing is the only evidence supporting a determination that there was deliberation.

**{21}** If the temporal period between arming himself and killing Fidel were the only evidence supporting a determination that the killing was deliberate, Defendant would be correct. *See State v. Tafoya*, 2012-NMSC-030, ¶ 49, 285 P.3d 604 (observing that simply establishing "that there was potentially enough time for deliberation" was insufficient in *Garcia*, 1992-NMSC-048, ¶ 30, and in *Adonis*, 2008-NMSC-059, ¶ 22). But the temporal period alone is not dispositive. *See Garcia*, 1992-NMSC-048, ¶ 30. Whether there is evidence that a defendant at some point decided to end the life of the victim and then acted is dispositive. *See id.* ¶¶ 30, 32. The State must establish that when Defendant struck Fidel with the pickaxe he intended the result to be that his father would die. *See id.* Here, the temporal period is not the only evidence of Defendant's intent.

**{22}** Defendant minimizes his incriminating statements and argues that the State failed to establish that he deliberated because arming oneself with a weapon is insufficient by itself to establish deliberation. Nevertheless a first responder who knew the family testified that when he arrived at the scene Defendant said to "tell them it wasn't me" or "that I didn't do it," or "something to that effect." When interviewed by the police, Defendant told officers, "My intestines, you can stretch those suckers from here to the other side of the world." and "Different channels do different things." When specifically asked about what happened in Fidel's mobile home, Defendant said that there was a party, "some kind of a hatchet party." Defendant also stated, "[Fidel] died in that house, . . . something happened in that house." and "[Fidel] didn't move no more, . . . he has a hatchet on his face now." Defendant indicated where the holes in Fidel's chest were located. Defendant further told officers that there had been a bunch of kids including Tori Spelling and Kim Kardashian naked and raping in the mobile home and that something bad happened: "Fidel got whacked by somebody . . . [because] he was an asshole sometimes." When asked whether Fidel did anything to him that evening, Defendant replied, "He was a stiff, . . . he was dead for three days already." Defendant offered, "I was just going to burn it down, . . . I died in that house more than once." Later when asked where Fidel was, Defendant said, "Dead, I hope."

**{23}** We cannot say as a matter of law that no rational fact finder could find Defendant's incriminating statements credible and make an inference of deliberative intent. *See State v. Fekete*, 1995-NMSC-049, ¶¶ 2, 11, 18, 120 N.M. 290, 901 P.2d 708 (declining to reverse a conviction for first-degree murder where questionably reliable statements of a paranoid schizophrenic defendant were the primary evidence of intent). And Defendant's individual statements that sound outlandish do not automatically render all Defendant's other statements unreliable. *See id.* ¶¶ 17-18 (concluding that there was sufficient evidence of deliberation where the fact finder considered all the statements, including those that supported and those that undermined the credibility of the incriminating statements). Some of Defendant's statements to the police appear to acknowledge that Fidel's death was a result of his injuries. The district court was free to reject the version of the facts it found less credible. *Rojo*, 1999-NMSC-001, ¶ 19 ("Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject [the d]efendant's version of the facts."). And the district court was free to make one inference and reject another based on evidence equally consistent with two conflicting inferences. *See State v. Garcia*, 2016-NMSC-034, ¶ 24, 384 P.3d 1076 (reiterating that New Mexico has rejected the "standard of appellate review for sufficiency of the evidence formulated 'in terms of a hypothesis of innocence'" (citation omitted)). We will not reverse if "'*any* rational' fact finder '*could* have found . . . the essential facts required'" to order a defendant's commitment. *Adonis*, 2008-NMSC-059, ¶ 12 (omission in original) (citation omitted). Although we note that some of Defendant's statements may suggest mental instability, we must base our determination upon the statements and evidence a rational fact finder could have relied upon. *See id.*

**{24}** Defendant also attempts to distinguish this case from cases where we have upheld the factual finding of deliberate intent. But the State introduced evidence—Defendant's statements and actions before, during, and after the killing including arming himself with the pickaxe—to support an inference of deliberation. *See State v. Flores*, 2010-NMSC-002, ¶¶ 22-23, 147 N.M. 542, 226 P.3d 641 (observing that sufficient evidence of deliberate intent may be established by a defendant's actions before, during, and after the crime); *State v. Begay*, 1998-NMSC-029, ¶ 45, 125 N.M. 541, 964 P.2d 102 (concluding that sufficient evidence of deliberate intent was established by a defendant's statements and actions including that the defendant "was carrying a knife").

**{25}** Fidel had at least eighteen areas of injury, including at least one "complex area of injury" that penetrated the skull and resulted in nasal bone and orbital bone fractures such that the medical examiner could not establish the exact number of strikes in this area. Any of the wounds to the head could have rendered Fidel unconscious, but the blow that penetrated his brain would have disabled him, and Fidel would not have been able to walk or move after that injury. *See State v. Cunningham*, 2000-NMSC-009, ¶ 28, 128 N.M. 711, 998 P.2d 176 (concluding that there was sufficient evidence of deliberate intent where a defendant fired the fatal shot after the victim was incapacitated and defenseless). Multiple blows penetrated Fidel's chest, but the final penetrating blow went through the third rib, the left lung, the heart, and the pulmonary artery and into the right lung before the pickaxe came to rest. And any of six wounds could have been the fatal blow. *See Duran*, 2006-NMSC-035, ¶¶ 9, 11 (holding that sufficient evidence of

deliberate intent was supported by a large number of wounds, a prolonged struggle, and animus); *see also State v. Smith*, 2016-NMSC-007, ¶¶ 22-23, 367 P.3d 420 (concluding that sufficient evidence of deliberate intent was supported by a large number of wounds, a prolonged attack, and telephone calls revealing that the defendant sought out the victim). Although, the medical examiner could not identify the exact order of all the blows, a rational fact finder could have determined that there was evidence of "overkill." *State v. Guerra*, 2012-NMSC-027, ¶ 29, 284 P.3d 1076 (concluding that sufficient evidence of deliberate intent was supported by the facts that the victim was unable to defend himself and that the defendant "stabbed the victim thirteen times and that many of the wounds were to vital organs").

**{26}** Further, the blood splatter analyst testified that blood flow patterns indicated that Fidel's body changed position during the attack. Fidel was lying on the floor facing upward when he received his final injuries. Although testimony did not reveal whether Fidel was incapacitated when his body changed position, and thus whether he turned himself or his body was turned over prior to the final blows, Fidel had been facing downward. The blood patterns indicated that (1) some of Fidel's injuries occurred while he was elevated (not lying on the floor), (2) some of the injuries occurred while he was facing down, and (3) at least two injuries occurred while Fidel was lying on his back. Considering all the facts and circumstances, a rational fact finder could have found that this was a prolonged, sustained attack. *Rojo*, 1999-NMSC-001, ¶ 24 (concluding that sufficient evidence of deliberate intent was supported by the fact that strangulation took minutes to accomplish).

**{27}** Defendant asks this Court to arrive at inferences different from those made by the district court as fact finder. For example, Defendant asks this Court to infer that he had no motive and that he "rain[ed] blows on Fidel within a frenzied minute, . . . wielding [the pickaxe] more like a hammer." The district court appears to have made different reasonable inferences, perhaps keying on the evidence that the pickaxe weighed twenty pounds and had an almost-four-foot-long handle—making it difficult to wield in the manner Defendant suggests— and on Defendant's statements that he hoped Fidel was dead, that someone probably "whacked" him, and that Fidel was an "asshole." Defendant asks this Court to infer that by calling for emergency services, Defendant did not try to hide evidence or lay the blame elsewhere. The district court appears to have made different reasonable inferences, perhaps from the evidence that Defendant asked the emergency responder to report that Defendant did not do it, that Defendant talked about burning the place down, that he tried to shift the culpability to someone at a "hatchet party," and that he waited until he was sure Fidel was dead before calling for emergency services. Defendant's arguments illustrate his continuing request for this Court to reweigh the evidence, which we decline to do. *See State v. Stephenson*, 2017-NMSC-002, ¶ 17, 389 P.3d 272 (observing that this Court will not reweigh the evidence or substitute its own judgment for the fact finder's judgment if there is sufficient evidence to support the verdict).

**{28}** In this case, a rational fact finder could have relied upon the evidence to find that Defendant (1) was embittered against his father Fidel and wanted him dead, (2) was

locked out of the mobile home by Fidel, (3) entered the mobile home without Fidel's knowledge while Fidel was inside the mobile home, (4) armed himself with the pickaxe either in the mobile home, before going into the mobile home, or by going out of the mobile home to the shed to retrieve it, (5) bludgeoned Fidel with the pickaxe in a manner that demonstrated overkill, (6) struck at least one fatal blow after he had incapacitated Fidel with one of the blows to the head, (7) waited until he was sure that Fidel was dead before attempting to reach emergency services, and (8) tried to deceive authorities and evade prosecution. The State thus presented sufficient evidence to establish deliberate, willful, and premeditated intent.

## III. CONCLUSION

{29} For the foregoing reasons, we conclude that we have jurisdiction pursuant to Article VI, Section 2 of the New Mexico Constitution to hear appeals from the Section 1.5 hearing where the district court ordered Defendant detained by the Department for a life term. Further, because sufficient evidence supports Defendant's criminal commitment for life, the time prescribed by Section 31-9-1.5(D)(2), we affirm the district court's order of commitment.

{30 } IT IS SO ORDERED.

**DAVID K. THOMSON, Justice**

**WE CONCUR:**

**JUDITH K. NAKAMURA, Chief Justice**

**BARBARA J. VIGIL, Justice**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**