This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

## IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date: June 9, 2025**

**No. S-1-SC-40006**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**RALPH PRIETO,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Mark Sanchez, District Judge**

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Santa Fe, NM
Aletheia V.P. Allen, Solicitor General
Albuquerque, NM

for Appellee

## DECISION

**ZAMORA, Justice.**

**{1}** Ralph Prieto challenges his convictions for first-degree murder with deliberate intent, armed robbery, and tampering with evidence. Defendant raises two arguments on appeal: (1) the evidence was insufficient to support the convictions and (2) the district court improperly failed to give his requested jury instruction concerning the police department's alleged failure to collect evidence. We exercise our discretion to affirm

Defendant's convictions by nonprecedential decision and thus limit our discussion of the law and the facts to that necessary to decide the merits of this appeal. *See* Rule 12-405(B) NMRA; *State v. Gonzales*, 1990-NMCA-040, ¶ 48, 110 N.M. 218, 794 P.2d 361 (explaining nonprecedential decisions are "written solely for the benefit of the parties," who "know the details of the case").

## I.      BACKGROUND

**{2}**      On Monday, February 24, 2020, police officers from the Hobbs Police Department (HPD) responded to a residence in Hobbs, New Mexico, to conduct a welfare check on Rick Ford (Victim), who lived there. HPD was responding to a 911 call placed by Victim's girlfriend, Becky Keen. Upon arrival, officers entered the home and discovered a blood trail and Victim's body lying face down in a hallway near a bedroom.

**{3}**      Investigators identified Defendant as a possible suspect soon after Victim was discovered. Investigators used surveillance video and cell phone ping information to track Defendant to a motel in Fort Worth, Texas. Defendant was arrested. A search of Defendant's motel room, Defendant's Lincoln pickup truck, and a backpack found with Defendant recovered coins, approximately $58,000 in cash, and the keys to a Dodge truck. The police also obtained a cell phone belonging to Defendant.

**{4}**      Defendant, who had been acquainted with and worked for Victim, was interviewed by Detective John Benavides shortly after he was arrested. Defendant did not deny being in Victim's house or taking his things but denied killing Victim. Defendant stated he returned to Victim's house around 3:00 or 4:00 in the morning after going to Roswell to purchase drugs on Victim's behalf and was confused when Victim failed to answer the door. Defendant stated he entered the house through a skylight above a bathroom near the entryway, saw blood on the floor, and discovered Victim lying face-down near a bedroom. He denied touching Victim other than to take his wallet, but admitted taking money, tools, and coins from Victim's house, taking money from Victim's wallet, trying to take items from Victim's safe, and taking Victim's truck.

**{5}**      Shortly after the discovery of Victim's body, Detective Mark Munro obtained a warrant seeking records from Verizon for cell phone numbers identified as belonging to Defendant and Phillip Cobb. Benavides testified at trial that Cobb's name came up in the early part of the investigation as police were trying to determine what happened to Victim. The warrant sought historical cell site or GPS locations, basic subscriber information, extended subscriber information, and stored electronic communication for both Defendant and Cobb, as well as "ping" (or active location) information for Defendant. The warrant was filed with the district court in February 2020, but no return on the warrant and inventory were filed with the court, as is required following execution of a search warrant. *See* Rule 5-211(D) NMRA (establishing that "[t]he return of the warrant, or any duplicate original, shall be made promptly after execution of the warrant" and that "[t]he return shall be accompanied by a written inventory of any property taken"). Detective Benavides, who was the lead investigator in the case, retired from HPD less than a year later in July 2021. In September 2022, after defense counsel

made several requests for the data, Detective Munro served a second warrant on Verizon, but it returned no records for either Cobb or Defendant.

**{6}** Prior to trial, Defendant filed a motion for sanctions for failure to preserve evidence or, in the alternative, failure to collect evidence important to his defense, which the State opposed. The district court held an evidentiary hearing on the motion and denied Defendant's motion but permitted Defendant to make an argument about the lack of cell phone records at trial if he chose to do so. After the close of the State's evidence at trial, Defendant sought an adverse jury instruction. After hearing additional testimony from Detective Munro outside the presence of the jury, the court denied the motion, appearing to find the uncollected evidence was not material.

**{7}** Following a trial, the jury convicted Defendant of first-degree murder (willful and deliberate), armed robbery, and tampering with evidence. He was subsequently sentenced to life imprisonment, and timely appealed to this Court.

## II.    DISCUSSION

### A.    The Evidence Was Sufficient To Convict Defendant of Willful and Deliberate Murder, Armed Robbery, and Tampering With Evidence

### 1.    Standard of review

**{8}** In reviewing a verdict for sufficient evidence, we employ a deferential standard, "resolv[ing] all disputed facts in favor of the State, indulg[ing] all reasonable inferences in support of the verdict, and disregard[ing] all evidence and inferences to the contrary." *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829. However, we carefully scrutinize the evidence "to ensure that, indeed, a rational jury *could* have found beyond a reasonable doubt the essential facts required for a conviction." *Id.* (internal quotation marks and citation omitted). "Contrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts." *State v. Duran*, 2006-NMSC-035, ¶ 5, 140 N.M. 94, 140 P.3d 515 (internal quotation marks and citation omitted). The sufficiency of the evidence is measured against the jury instructions, which "become the law of the case." *State v. Arrendondo*, 2012-NMSC-013, ¶ 18, 278 P.3d 517 (internal quotation marks and citation omitted).

### 2.    Sufficient evidence supported Defendant's conviction for first-degree murder

**{9}** To sustain a conviction for first degree murder by willful and deliberate killing, the State was required to prove that Defendant killed Victim and that the killing was done with the deliberate intention to take away the life of Victim. *See* UJI 14-201 NMRA (describing the essential elements of willful and deliberate murder). The jury was instructed that deliberate intention means "arrived at or determined upon as a result of careful thought and the weighing of the consideration for and against the proposed course of action," even if such judgment and consideration is "arrived at in a short period of time." *Id.*

**{10}**   Defendant argues that "the State failed to prove that [Defendant] was the person who killed [Victim.]" Specifically, Defendant asserts the State's timeline for the murder is contradicted by evidence that someone logged into Victim's security system after the State alleges Victim was killed. He further contends that no firearm was ever recovered and video of Defendant leaving Victim's house fails to show him carrying a firearm.

**{11}**   The State presented sufficient evidence to prove that Defendant deliberately killed Victim. First, the State presented evidence of Victim's security-camera footage showing Defendant leaving Victim's home moments after Victim is seen entering the home. The security-camera footage was circumstantial evidence that Defendant was present with Victim in his home at the time Victim was shot. Security camera footage showed Victim entering his residence at 1:49 a.m. on Sunday, February 23, 2020. Victim's security system recorded a glass break or loud noise one minute later, at 1:50 a.m., which the jury could reasonably have inferred was caused by Defendant breaking through the skylight, as he admitted doing at some point that night. Two minutes later, at 1:52 a.m., security-camera footage showed Defendant leaving Victim's house through the front door, locking it, walking to Victim's pickup truck, getting in, and pulling away. There is no evidence in the record of any other person walking out of Victim's home again before Victim's body was discovered by law enforcement. Evidence that the defendant was the last person seen with the victim is relevant evidence supporting a finding that the defendant killed the victim. *See, e.g.*, *Rojo*, 1999-NMSC-001, ¶¶ 22-23 (relying in part on evidence that the defendant was the last person seen with the victim to support the conclusion that the defendant killed the victim).

**{12}**   Defendant argues this security-system evidence is inconsistent with the State's theory of the crime. He contends Victim must have been alive after Defendant left Victim's house at 1:52 a.m. because someone accessed Victim's security-system livestream using Victim's email log-in at 1:57 a.m. However, the State presented evidence that Victim's security-system livestream could be accessed by anyone with access to Victim's phone or computer, so long as the account was logged in, and that Victim's phone was not with him when his body was found.

**{13}**   Second, the physical evidence supported the State's theory that Victim was shot in the entryway of his home just after walking in the front door. Investigators found an "arterial spray pattern" and a pool of blood in the entryway of Victim's home near several boxes of tiles that had been placed against the front door. The State's expert testified that the pattern of blood on the floor from the entryway to the place where Victim was found indicated Victim had been shot in the entryway and then dragged to the location where his body was found. Additionally, blood found on Victim's pant leg contained DNA matching Defendant. Finally, two .22 caliber spent bullet casings were recovered in or near the front entryway.

**{14}**   Defendant also made inculpatory statements to two people in the hours after Victim was killed. Inculpatory statements made by a defendant can support a jury's finding that the defendant deliberately killed the victim. *Duran*, 2006-NMSC-035, ¶ 9; *see also Rojo*, 1999-NMSC-001, ¶¶ 22-24 (relying in part on the defendant's inculpatory statements to support the conclusion that the defendant killed the victim deliberately).

Wesley Busby testified that Defendant met him the evening of February 23 to purchase marijuana. When Busby noticed that Defendant was driving Victim's truck, he asked Defendant what he was doing with it and Defendant responded, "I killed [Victim]." Defendant reiterated a second time that he had killed Victim and showed Busby "a box full of money" which Defendant told Busby amounted to $140,000. The State also introduced evidence that Defendant sent a Facebook message to a different person stating, "bro I blanked hus [sic] ass he laying [sic] the hall way on other side of the house."

{15}    "Deliberate intent may be inferred from the particular circumstances of the killing as proved by the State through the presentation of physical evidence." *Duran*, 2006-NMSC-035, ¶ 8. Here, a reasonable juror could have determined that the blood pattern, security-system evidence, ballistics evidence, and Defendant's admissions supported the State's theory that Defendant was already armed with a gun when he broke through the skylight and that he shot Victim twice as soon as Victim walked in the door. *See State v. Baca*, 2019-NMSC-014, ¶ 26, 448 P.3d 576 (concluding that blood pattern evidence showing the location and positioning of the victim's body when he was struck by a pickaxe supported the state's theory of a deliberate killing because it indicated "a prolonged, sustained attack"); *Arrendondo*, 2012-NMSC-013, ¶ 36 (holding that bullet casings may provide evidence of where a person was when firing a gun).

{16}    Finally, Defendant's admission in his recorded interview that he was angry at Victim and believed Victim owed him money provided additional evidence of intent. *See State v. Astorga,* 2015-NMSC-007, ¶ 64, 343 P.3d 1245 (holding evidence that the defendant had a motive to kill the victim "may be probative of a deliberative intention").

{17}    Viewing the evidence in the light most favorable to the State and indulging all permissible inferences in favor of the verdict, *Rojo*, 1999-NMSC-001, ¶ 19, we hold there was sufficient evidence to support Defendant's conviction for first degree murder with deliberate intent.

### 3.    Sufficient evidence supported Defendant's conviction for armed robbery

{18}    Defendant argues in conclusory fashion that the State "failed to prove that he was the person who . . . stole from [Victim's] safe." To support a conviction for armed robbery, the State was required to prove that (1) [D]efendant took and carried away money and coins, from [Victim] or from his immediate control intending to permanently deprive [Victim] of his money and coins; (2) [D]efendant was armed with a firearm; [and] (3) [D]efendant took the money and coins by force or violence." *See* UJI 14-1621 NMRA (describing the essential elements of armed robbery).

{19}    Evidence that the victim's property was found in the defendant's possession after a robbery is relevant evidence tending to show the defendant committed the robbery. *See generally State v. Johnson*, 2010-NMSC-016, ¶ 58, 148 N.M. 50, 229 P.3d 523 (holding that evidence that stolen items were transferred from the victim's room to the defendant's car and that defendant did not possess the items prior to the robbery were, in addition to other items of evidence, "substantial evidence of either a direct or

circumstantial nature" permitting conviction). Here, the State presented evidence that Victim kept a safe, large amounts of cash, and collectible coins in his home. Following the discovery of Victim's body, investigators discovered Victim's safe tipped forward, with a hole cut into it through the back. A crowbar and saw (or hand grinder) was found at the crime scene near the safe, and coins and jewelry were strewn around the safe. A drop of blood found on the safe matched Defendant's DNA. Defendant admitted to law enforcement that he took money from Victim, that he took Victim's tools that night, and that he attempted to place his hand in the safe to take its contents. Because investigators recovered several collectible coins and $58,000 in cash from Defendant's possessions after he was taken into custody, a reasonable juror could have found Defendant took Victim's property from his immediate possession. *See id.*; *see also State v. Verdugo*, 2007-NMCA-095, ¶ 27, 142 N.M. 267, 164 P.3d 966 (concluding evidence was sufficient to sustain conviction for robbery where evidence showed the defendant grabbed the victim's purse, the purse strap broke, and an item from the purse was found during inventory search of the defendant's vehicle).

**{20}**    The taking of a victim's property after a killing can constitute armed robbery even if done hours after the killing, so long as the killing and robbery are part of the "same transaction." *State v. Montoya*, 2017-NMCA-033, ¶¶ 6-8, 392 P.3d 223 (citing *State v. Barela*, S-1-SC-32506, dec. (N.M. Mar. 28, 2013) (nonprecedential)). In this case, the State presented evidence that Defendant killed Victim in the early morning hours of February 23, then either immediately or sometime in the hours thereafter returned to Victim's home and took cash and collectible coins from Victim's safe and home. The evidence was sufficient to establish the elements of the crime based on this theory. *See id.* ¶ 8.

### 4.    Sufficient evidence supported Defendant's conviction for tampering with evidence

**{21}**    Finally, Defendant argues in conclusory fashion that the State failed to prove he tampered with evidence. To convict Defendant of tampering with evidence, the State was required to prove that Defendant "placed the body of [Victim]," by dragging it to the rear of Victim's home, "intend[ing] to prevent the apprehension, prosecution or conviction of himself for first degree murder." *See* UJI 14-2241 NMRA (describing the essential elements of tampering with evidence).

**{22}**    Evidence that the defendant moved the victim's body to avoid detection is sufficient to support a conviction for tampering with evidence. *See State v. Schwartz*, 2014-NMCA-066, ¶ 36, 327 P.3d 1108 (concluding evidence the defendant placed the victim's body in an alley was sufficient to support conviction for tampering with evidence). In this case, blood evidence and the testimony of the crime scene investigator supported the State's theory that Defendant shot Victim in the entryway and dragged Victim to a hallway near the back bedroom. Defendant admitted that he was present with Victim's body after Victim had died, and that he cut his hand when breaking in through the skylight. A blood droplet found near where Victim was found contained Defendant's DNA, supporting an inference that Defendant's cut hand bled onto the floor as he dragged Victim's body away from the front of the house. The pattern on the

bottom of shoes recovered from Defendant was consistent with a shoe pattern found in the Victim's blood and Defendant's DNA was found on Victim's pant leg. Defendant's Facebook message stating "bro I blanked hus [sic] ass he laying [sic] the hall way on other side of the house" further supports an inference that Defendant moved Victim's body from the entryway to the "other side of the house." *See Rojo*, 1999-NMSC-001, ¶ 26 (concluding there was sufficient evidence of tampering where the defendant "stated that he had killed someone and thrown the body in the trash").

**{23}** The intent to impede an investigation is "often inferred from an overt act of the defendant." *Duran*, 2006-NMSC-035, ¶ 14. In this case, the State presented evidence that someone placed boxes of heavy tile against the inside of the front door after Victim had entered, blocking the door from opening from the outside. A reasonable juror could have determined that Defendant moved Victim's body to the rear of the house and placed the tile boxes against the door to prevent entry of someone who would detect the crime. An intent to impede an investigation may be inferred from an overt act taken to move evidence of the crime. *State v. Johnson*, 2004-NMSC-029, ¶ 54, 136 N.M. 348, 98 P.3d 998. We conclude there was sufficient evidence to prove beyond a reasonable doubt that Defendant moved Victim's body from the front to the rear of the house to avoid detection of his killing of Victim.

**B.    The District Court Did Not Abuse Its Discretion in Denying Defendant's Motion for Sanctions for the State's Failure To Collect Evidence**

**{24}** Defendant argues his due process rights were violated when law enforcement failed to collect cell phone records from his phone and from the phone of Phillip Cobb which, he argues, could have exculpated him and/or inculpated Cobb. The parties agree that *State v. Ware*, 1994-NMSC-091, 118 N.M. 319, 881 P.2d 679, is controlling.

**{25}** In *Ware*, we adopted a two-part test to determine whether a sanction should be imposed for the state's failure to collect evidence. *Id.* ¶ 25. First, as a threshold matter, the defendant must demonstrate the evidence at issue is material to his or her defense—that is, that "there is a reasonable probability that, had the evidence been available to the defense, the result of the proceeding would have been different." *Id.* (text only) (citation omitted).[1] "The determination of evidence materiality is a question of law for the court." *Id.*

**{26}** Second, "if the evidence is material to the defendant's defense, then the conduct of the investigating officers is considered." *Id.* ¶ 26. If the officer's conduct was "merely negligent, an oversight, or done in good faith," no sanctions are warranted, but the defendant may still cross-examine the state's witnesses about the investigation's deficiencies and argue the issue to the jury. *Id.* If the failure to collect evidence is done in bad faith—that is, in an effort to prejudice the defense—the court may order the evidence suppressed. *Id.* Finally, "[i]f it is determined that the officers were grossly negligent in failing to gather the evidence—for example, by acting directly contrary to

---

[1]The "text only" parenthetical used herein indicates the omission of any of the following—internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text itself otherwise unchanged.

standard police investigatory procedure—then the trial court may instruct the jury that it can infer that the material evidence not gathered from the crime scene would be unfavorable to the State." *Id.* We review the trial court's decision on the imposition of a sanction for abuse of discretion. *See id.* ¶ 27 (concluding trial court's decision to suppress evidence was an abuse of discretion). A trial court abuses its discretion in deciding whether or not to impose a sanction if its decision is "clearly against the logic and effect of the facts and circumstances of the case." *State v. Harper*, 2011-NMSC-044, ¶ 16, 150 N.M. 745, 266 P.3d 25 (text only) (citation omitted).

**{27}** Defendant argues the evidence was material because the State's timeline was so important to the circumstantial case against him. According to Defendant, data from his cell phone might have provided evidence consistent with his defense that he was not in the house when Victim was killed. Defendant also argues that evidence from Cobb's phone could have helped the defense "potentially establish the ability of a third person to have committed the crime." The State responds that the Verizon evidence was not material because "in light of the substantial evidence showing Defendant's whereabouts at key times on February 23, 2020 . . . there is no 'reasonable probability that, had the evidence been available to the defense, the result of the proceeding would have been different.'" (Quoting *Ware*, 1994-NMSC-091, ¶ 25).

**{28}** Defendant has failed to meet his burden of establishing the materiality of the Cobb cell phone records. Although Cobb was initially identified as a person of interest, the lead detective on the case testified that Cobb was eliminated by HPD investigators. As a result, Defendant's arguments about how information from Cobb's phone might have assisted his defense are purely speculative. A defendant must explain how it is reasonably *probable*, not merely possible, that introduction of the uncollected evidence would change the outcome of a trial. *State v. Torrez,* 2013-NMSC-034, ¶ 31, 305 P.3d 944. Speculation about what might be contained in uncollected evidence is insufficient. *See State v. Salas,* 2017-NMCA-057, ¶ 15, 400 P.3d 251 (finding defendant failed to establish materiality because he failed to present any evidence that uncollected video captured the charged offense or immediately preceding interaction between the defendant and the victim).

**{29}** Whether Defendant has established materiality with respect to his own cell phone data is a closer call. If, as Defendant asserts, the location data from his phone would have established his location as somewhere other than in the house with Victim during the moments the State alleges Victim was shot, the evidence that Defendant killed Victim would have been much weaker. As Defendant contends, the State's timeline was critical to its case, and evidence that may directly rebut the state's case is likely to be material. *See Ware*, 1994-NMSC-091, ¶¶ 6, 27 (concluding evidence of blood, fluids, or other substances found on the rock used to batter the victim was material where the defendant denied having battered the victim with the rock); *see also State v. Martinez*, A-1-CA-40514, mem. op. ¶¶ 9-10 (N.M. Ct. App. Apr. 17, 2024) (nonprecedential), *cert. denied* (S-1-SC-40424, June 27, 2024) (concluding audio evidence of encounter between the defendant and arresting officers was material because it would have established whether the defendant's or the state's version of events was correct).

**{30}** The State relied significantly on the security-system evidence showing Victim arriving home at 1:49 a.m., a loud sound happening at 1:50 a.m., and Defendant leaving Victim's residence at 1:52 a.m. to prove that Defendant shot Victim at that time. Defendant's central defense was that he left Victim's house to go to Roswell to buy drugs and that he did not return to Victim's home until "three [or] four" in the morning, after Victim was already dead. The defense argued that, because there was nothing in Defendant's hands when he left Victim's house at 1:52 a.m., cell phone data showing Defendant somewhere else during the day would have disproved the State's theory that he returned to the house after the killing. The cell phone at issue was activated at some point after midnight and before 2:00 a.m. on February 23, 2020, although detectives could not establish the precise time without the Verizon records. Additionally, Detective Munro testified that a Verizon prepaid phone such as Defendant's would be no less likely than a phone operating on a subscriber basis to contain location data. Although still speculative, Defendant's contention that the phone *could* have rebutted the State's timeline finds at least some support in the record.

**{31}** However, even if the evidence was material, Defendant has not established the officers acted with gross negligence in failing to collect it. Defendant rests his argument on Detectives Benavides and Munro's failure to "follow police department procedure or the Rules of Criminal Procedure when they failed to file a return on the execution of the search warrant." He relies on language in our opinion in *Ware* that gross negligence may be found where officers "[act] directly contrary to standard police investigatory procedure." 1994-NMSC-091, ¶ 26. However, in setting out this example, we hardly established a bright line rule establishing that *any* deviation from procedure would rise to gross negligence. To the contrary, we contrasted gross negligence with conduct by the State that is "merely negligent, *an oversight*, or done in good faith." *Id.* (emphasis added). We also counseled deference to investigators' right to make "judgment call[s]" in determining which evidence they would collect in a given case. *Id.* ¶ 27.

**{32}** Defendant has failed to demonstrate that the detectives' failure to follow up on the first Verizon warrant constituted anything more than an oversight. Detective Benavides testified with uncertainty about whether he recalled receiving evidence other than the ping data from Verizon. He also testified that he did not recall if any Verizon returns went to his email inbox. Detective Benavides retired in July 2021 but testified that his involvement in the case largely concluded after charges were filed against Defendant in March 2020, when Detective Munro took over. His email messages were deleted from HPD's server after he retired.

**{33}** The failure to collect evidence as a result of mistake or inattention does not constitute gross negligence. *Id.* ¶ 26; *see also State v. Garcia*, A-1-CA-34571, mem. op. ¶ 19 (N.M. Ct. App. Mar. 15, 2017) (nonprecedential) (concluding officer's failure to record the beginning of interaction with the defendant was the result of oversight where officer failed to account for three-second delay in activation and testified the camera was unreliable and "not very user-friendly"). We hold the evidence in this case is most consistent with the conclusion that the detectives were merely negligent and overlooked the fact that the Verizon warrant failed to result in a return of the requested records, likely due to Detective Benavides' retirement and his failure to anticipate that any

records collected through his email address would be erased upon his departure. Such conduct does not rise to the level of gross negligence. *Ware*, 1994-NMSC-091, ¶ 26; *see also Paiz v. State Farm Fire & Cas. Co.*, 1994-NMSC-079, ¶ 26, 118 N.M. 203, 880 P.2d 300 (characterizing gross negligence as "a failure to exercise even slight care").

**{34}** Nor are we persuaded that the detectives' failure to follow court and departmental rules governing the execution of returns on issued warrants rises to gross negligence. Rule 5-211(D) requires that the return of a warrant "shall be made promptly after execution of the warrant." Detective Munro testified that HPD practice is to file a return with the court within three days of return of a search warrant, but no return was filed for the first Verizon warrant because no records were received. Sanctions are inappropriate when the failure to collect evidence did not result from gross negligence. *Ware,* 1994-NMSC-091, ¶ 26.[2]

**{35}** On the record before us, we cannot say the district court's decision not to sanction the State for its failure to collect the Verizon records was "clearly against the logic and effect of the facts and circumstances of the case." *Harper*, 2011-NMSC-044, ¶ 16 (internal quotation marks and citation omitted). We hold the court did not abuse its discretion in denying Defendant's motion for sanctions and requested jury instruction.

## III. CONCLUSION

**{36}** We conclude that sufficient evidence supported Defendant's convictions for first degree murder, armed robbery, and tampering with evidence, and the trial court did not abuse its discretion in declining to sanction the State for its failure to collect evidence. We therefore affirm Defendant's convictions.

**{37} IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Justice**

**WE CONCUR:**

**DAVID K. THOMSON, Chief Justice**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**JULIE J. VARGAS, Justice**

---

2We note that defense counsel did not begin asking for the Verizon records until November 2021, even though Defendant's recorded interview (conducted in February 2020) established that his alibi would rest on information about his location. "Defendants must make an effort to discover or obtain evidence, which they are or should be aware of, in support of their defense." *State v. Laney*, 2003-NMCA-144, ¶ 28, 134 N.M. 648, 81 P.3d 591.